933 P.2d 1269

**STATE of Arizona, Appellee,**

v.

**Edward PALENKAS, Appellant.**

**No. 1 CA–CR 95–0752.**

Court of Appeals of Arizona, Division 1, Department D.

Nov. 5, 1996.

As Amended Dec. 19, 1996.

Reconsideration Denied Dec. 19, 1996.

Review Denied March 25, 1997. *

* Jones, V.C.J., of the Supreme Court, voted to grant the State's Petition for Review as to Issues 1 and 2.

Grant Woods, Attorney General by Paul J. McMurdie, Chief Counsel, Criminal Appeals Section, and Mona Peugh–Baskin, Assistant Attorney General, Phoenix, for Appellee.

Debus & Kazan, Ltd. by Tracey Wester-hausen, Phoenix, and Budoff & Ross by Marc Budoff, Phoenix, for Appellant.

OPINION

VOSS, Judge.

Edward Palenkas ("defendant") appeals from his convictions, after a jury trial, of one count of reckless manslaughter and one count of leaving the scene of a fatal injury accident. The only issue we address in this opinion[1] is whether the prosecutor's use of defendant's invocation of his constitutional right to refuse a warrantless search and the fact that he contacted his attorney, as evidence of guilt, deprived him of due process and requires a new trial. Because we find that the prosecutor's conduct, not invited by defendant, resulted in prejudicial, fundamental unfairness that violated defendant's right to due process, we reverse and remand for new trial.

## FACTS AND PROCEDURAL HISTORY

We view the facts in the light most favorable to sustaining the jury's verdicts. *See State v. Atwood,* 171 Ariz. 576, 596, 832 P.2d 593, 613 (1992), *cert. denied,* 506 U.S. 1084, 113 S.Ct. 1058, 122 L.Ed.2d 364 (1993).

### A. The Hit–and–Run

The charges against defendant arise from a fatal hit-and-run accident in Scottsdale on the evening of April 12, 1994. At approximately 7:40 p.m., the victim, an 11 year-old-boy, and his father were walking along the roadside of Frank Lloyd Wright Boulevard, facing oncoming traffic. The road had no sidewalk in this area. While walking along the roadside, the victim and his father approached some dirt mounds created by the recent digging of a trench for gas pipelines. The trench extended across the road, where it was covered by metal plates. The metal plates ended at the shoulder of the road, however, leaving the trench exposed. Thus, to cross the trench, pedestrians had to walk around the piles of dirt into the roadway.

---

1. By separate unpublished decision filed this date, we address the remaining issues raised by defendant on appeal, because they are likely to arise again upon retrial. Those issues are not relevant to our analysis in this opinion. *See Fenn v. Fenn,* 174 Ariz. 84, 85, 847 P.2d 129, 130 (App.1993).

The victim and his father walked around the mounds in the direction of the street and then returned to the shoulder of the road. As the two continued walking, the father noticed an approaching car "weaving" and "driving very close on the inside of the road." The car left the road and briefly traveled along the dirt shoulder. The victim's father testified at trial that the car "erratically changed its direction" as it passed him and that it then struck the victim. The force of the impact threw the victim's body approximately 65 to 70 feet back onto one of the mounds of dirt. The victim's father observed the car, which was followed by another car, continue to a nearby intersection. The car stopped at the intersection and then drove on. The victim died at the scene.

## B.  The Investigation

Relying on the father's description of the vehicle as "a dark-colored, full-size vehicle, possibly four-door, with tinted windows," the Scottsdale Police Department initially issued an attempt to locate a vehicle matching that description and having damage to the right front portion of the car. However, paint chips removed from the victim's body and clothing, and amber lens fragments collected from the accident scene, soon led the police to believe that the vehicle that struck the victim was in fact a 1984 or newer cream-colored Rolls Royce or Bentley. After obtaining a list of registered owners of cars matching this description from the Department of Motor Vehicles, the police began contacting owners at their homes to request permission to view their vehicles.

In pursuing this investigation, Scottsdale police detectives Tom Vanmeter and Don Bellendier contacted defendant at his home on the evening of April 13, slightly more than 24 hours after the incident occurred. Defendant owned a 1986 magnolia-colored Rolls Royce Silver Spur. The detectives informed defendant that they were investigating a collision involving the death of an 11 year-old boy and asked to see his Rolls Royce. Defendant responded, "I don't think that I can do that." At trial, defendant explained that he had refused consent because he was waiting for a return phone call from his lawyer about how to proceed.

The detectives subsequently obtained a warrant to search defendant's residence, and the warrant was executed the next day. The right front portion of defendant's car revealed damage consistent with striking the victim.

## C.  Defendant's Version of the Events

The evidence introduced at trial revealed that, on the evening of the accident, defendant dined with his close friend, Robert Davis, at the Reata Pass Steakhouse in Scottsdale, a restaurant that the two men frequented. Defendant and Davis arrived at the restaurant in separate cars. Defendant testified that he consumed two mixed drinks while at the restaurant, and that he consumed no other alcohol that evening. Testimony from employees at the restaurant, however, indicated that defendant's speech was slurred and slower than usual, that his face was flushed, and that his coordination was somewhat impaired. The evidence also revealed that defendant slipped or stumbled on a ramp when leaving the restaurant, and out of concern that defendant might have been "buzzed," the restaurant's bartender, who knew defendant well, twice asked whether defendant wanted to give him his keys so that he could drive him home. Defendant indicated that he was fine, but then told Davis to follow him home.

While driving home from the restaurant, defendant struck and killed the victim. Although defendant observed the obvious damage to his car when he arrived home that evening, he testified that he believed the damage was caused by striking some construction equipment or by hitting an object possibly thrown through the air after being struck by a "dark vehicle" traveling in front of defendant's Rolls Royce. Defendant telephoned Bob Davis later that night, informed him about the damage to his vehicle, and asked whether Davis had seen him hit a barricade. Davis indicated that he had not seen defendant's car hit anything.

Defendant telephoned Davis again the next morning to tell him that he had seen a news report on television about the hit-and-run accident on Frank Lloyd Wright Boulevard. Davis testified that defendant commented, "We came through there approximately the same time, and . . . it could have been me that hit the boy."

### D. Procedural History

A Maricopa County Grand Jury indicted defendant on April 21, 1994, charging him with one count of manslaughter and one count of leaving the scene of a fatal accident. At trial, defendant did not contest the state's evidence linking his vehicle to the hit-and-run. Rather, his defense was that the victim's death was a tragic accident which he could neither have foreseen nor avoided.

The jury convicted defendant on both counts of the indictment. The trial court sentenced defendant to presumptive terms of ten and one-half years for the manslaughter conviction and one and one-half years for leaving the scene of a fatal accident, to run concurrently. Defendant timely appealed.

### DISCUSSION

I. *DEFENDANT'S INVOCATION OF HIS CONSTITUTIONAL RIGHTS INTRODUCED AS EVIDENCE OF GUILT AT TRIAL*

### A. Defendant's Motion in Limine

■ Several months before trial, defendant filed a motion *in limine* requesting that the court preclude the state from "introducing evidence through any means that comments on or infers the defendant's consulta-

tion with counsel, and his refusal to grant consent to a search and seizure of evidence at his residence."[2] The state did not object to the motion *in limine*, and informed the court, "Obviously, we've conceded those issues."[3] The court then granted defendant's motion, ruling as follows:

> It's ordered granting the motion in limine regarding comments on invocation of rights, right to counsel, and the similar motion to suppress evidence. . . .

### B. Testimony in Violation of the Motion in Limine

At trial, the state called Thomas Vanmeter and Don Bellendier, the Scottsdale Police Department detectives who contacted defendant at his residence the night after the incident. The prosecutor first questioned Detective Vanmeter:

Q: [D]id you ask the Defendant if you could look at his car?

A: Detective Bellendier did.

Q: And what was the Defendant's response to that?

A: I don't have it. I have not read Detective Bellendier's report. *But it was basically, "No."*

(Emphasis added.) The prosecutor then questioned Detective Bellendier on the same issue:

Q: Did you tell the Defendant that you wanted to look at his car at some point?

A: While we were standing out front, we stated that we would like to look at it. Then, when we walked inside, we again stated that.

---

**2.** The Arizona Supreme Court has held that, in the criminal context, a motion *in limine* "is nothing more than a motion to suppress specifically authorized by Rule 16, Arizona Rules of Criminal Procedure." *State v. Rodriguez,* 126 Ariz. 28, 30, 612 P.2d 484, 486 (1980).

**3.** The state argues on appeal that its "concession" was limited to preclusion of references to defendant's contact with his attorney. Although that is the only issue conceded in the state's

written response to defendant's motion *in limine,* the state did not otherwise object to the preclusion of references to defendant's refusal to consent to a warrantless search of his car, and the prosecutor clearly conceded "those issues" in open court when asked if she had any objection to the motion. We therefore reject the state's position that the court's *in limine* ruling was limited to evidence of defendant's contact with his attorney.

Q: And did you then follow the Defendant somewhere after that?

A: He had asked us to come into the house.

. . . .

Q: Did he tell you, prior to you following him into the den, that he was going to allow you to look at the car?

A: No.

. . . .

Q: And when you went into the den, you indicated that—you asked the Defendant again if you could look at his car. Is that right?

A: Yes.

Q: And what did he say to you at that time?

A: *He stated that he didn't think he could do that.*

Q: Did you ask the Defendant, immediately after that, any questions?

A: Yes.

Q: What did you ask him?

[DEFENSE COUNSEL:] Objection. May we approach, Your Honor?

(Emphasis added.) At that point, an off-the-record bench conference ensued,[4] after which the prosecutor did not return to this line of questioning.

Defendant later provided the following testimony on direct examination concerning his contact with his attorney:

Q: Did you ever call the police to check and find out about the dark car?

A: No, I did not.

Q: Did you think about that?

A: I thought of it, yes.

Q: What did you do?

A: Well, later in the afternoon I called Steve.

Q: Who is Steve?

A: My attorney and friend.

Q: What kind of attorney?

A: Family attorney. Steve Jackson.

Q: Why would you call Steve?

A: Well, to ask him if I was supposed to handle this a certain way. I thought maybe I'd be a witness to the accident.

Q: So, in your mind you were thinking maybe you should do something?

A: Maybe I should do something, yes.

Q: Now, is Steve the kind of person that you sort of use as a lawyer and advisor?

A: Lawyer and advisor, yes, friend.

Defense counsel then questioned defendant about his conversation with Scottsdale police detectives at his home:

Q: Did you let them into the house?

A: Yes, I let them in.

Q: What did they ask you [if] they could do?

A: They asked if I owned a Rolls.

Q: And did you answer them?

A: I answered them that I did.

Q: And what did they want to do?

A: They wanted to see it.

Q: And what did you tell them?

A: *I told them to wait a minute—that I haven't heard back from Steve yet—until I call him.*

(Emphasis added.)

In response to defendant's testimony concerning his attempt to contact his attorney,

---

4. Our courts have previously disapproved the practice of holding unrecorded bench conferences on trial motions. *See State v. Fletcher,* 149 Ariz. 187, 189, 717 P.2d 866, 868 (1986). In this case, however, we cannot fault defense counsel for the lack of a contemporaneous record because the trial court precluded speaking objections, and indicated that, "because the courtrooms are so small, and we're so close to the jury, unfortunately we can't make a simultaneous record, what's stated at the bench conference. So what I do is make a ruling there, tell you guys about it, if anyone wants to make a record on it later, we go back and do that."

the prosecutor sought to introduce handwritten notes, previously held inadmissible by the court, which had been seized from defendant's residence and suggested that defendant contacted an attorney the day after the incident because he was concerned about his own involvement in the victim's death, rather than because of questions about his obligations as a possible witness to the accident. The trial court denied the prosecutor's request to introduce the evidence, but concluded that whether defendant "consulted with counsel, and when and with whom, has become relevant because the defense has made it so." The court indicated, however, that it would continue to entertain this objection on "a question by question basis."

On cross-examination, the prosecutor further questioned defendant regarding his contact with an attorney:

Q: [Y]ou didn't call the police and report what you knew about the dark car, did you?

A: I did not.

Q: As a matter of fact, you called your attorney; is that right?

A: That was later in the afternoon.

Q: And you got—strike that. You actually at some point in time, got information with respect to another attorney that you could get advice from; isn't that right, sir?

[DEFENSE COUNSEL]: Objection. May we approach, Your Honor?

THE COURT: Sure. Come up.

(Whereupon, a discussion at the bench took place.)

THE COURT: Sorry for the delay. I think we've got it worked out.

Q: And did you talk with your lawyer that day, sir?

A: Excuse me?

Q: Did you talk with your lawyer that day?

A: Yes, I did.

Q: And that was Mr. Jackson?

A: Yes.

Q: And after you spoke with your lawyer, you still didn't go to the police and report this information about this dark car; is that right?

A: No, I didn't.

Q: Did you speak with any other lawyers that day, sir?

A: Not until much later, until after the police came.

Q: Prior to the time the police arrived, did you speak with any other lawyers besides Mr. Jackson?

A: No, I did not.

The prosecutor then questioned defendant regarding his response to the police detectives' request to see his Rolls Royce:

Q: And after they asked you if they could look at your car, you said, "No, I don't think I can let you do that," is that correct, sir?

A: *I told them I wanted to call my attorney first.* He was supposed to get back with me, and he never did.

Q: Sir, wasn't the · evidence that you heard at trial from the police officers that they asked you if they could look at your Rolls–Royce, not once but twice, and you said to them, "No, I don't think I can let you do that." Isn't that right, sir?

A: *I might have told them I can't let them look at it until I talk to my attorney.*

Q: So you, basically—at that point in time, *you basically refused to let the police look at your car, correct?*

A: *Until I talked to my lawyer.*

(Emphasis added.) Defense counsel again objected and a bench conference ensued, after which the trial court sustained defense counsel's objection "on the basis that [the question has] been asked and answered." Later that day, defense counsel made a record indicating that he had moved for a mistrial during the bench conference because

the prosecutor's questioning of defendant had an "impact upon [defendant's] assertion of his Constitutional Rights." The trial court again denied defendant's motion for mistrial.

### C. Prosecutorial Comments

During closing argument, the prosecutor returned to the issues of defendant's contact with an attorney and his refusal to consent to a search:

> [The detectives] asked to look at the defendant's Rolls–Royce. He didn't ask them why. He simply turned around, he walked into the house, they followed him in there, followed him into his study. *They ask him again when they got into the study, "I'd like to look at your car." And the defendant, at that point, said to them, "I don't think I can do that."*

> \* \* \* \* \* \*

> [Defendant] [d]idn't call the police then and report [that he had seen a dark car at the scene], *he called his lawyer. And you know why, because he knew he was the one who hit that boy.* He knew he was involved in the death of [the victim]. He knew that there wasn't any dark car. He was concerned, at that point, about one thing, protecting himself. *He was concerned about not being arrested by the police. And that's why he called his lawyer.* And that's why he didn't call the police at that time.

> \* \* \* \* \* \*

> And when the police asked to look at his car, *instead of saying, "Well, of course, Officer, of course you can look at my car. I don't have anything to hide," what did he say? He said, "I don't think I can let you do that."*

> \* \* \* \* \* \*

> Now, why is it that someone, a reasonable person, would behave the way the defendant behaved that evening. You know, ... this is the defense, the defense raised this. Someone who has a defense would put [it], *it is a good person who*

*simply had a bad thing happen to them.... A reasonable person, a responsible person, a good person wouldn't do that, a person who had nothing to hide wouldn't do those things.*

And that's the big problem with the defense in this case. *The defendant's later actions are simply inconsistent with the defense.* The defendant did not act reasonably. And that's because he had something to hide....

Now, the defense—*I think that their theme was that [bad] things happen to [good] people.* And, again, all of that is inconsistent, inconsistent with the facts you've heard in this case. *Because a good person would have acted differently from the way the defendant behaved....*

> \* \* \* \* \* \*

*Good people help the police in pursuing an investigation of this type. They don't frustrate the police by requiring them to get a search warrant to find evidence of a crime. Good people take responsibility for their actions.*

(Emphasis added.)

## II. THE DUE PROCESS VIOLATION

On appeal, defendant argues that the prosecutor's use of defendant's invocation of his constitutional right to refuse to consent to a warrantless search and the fact that he contacted his attorney as evidence of his guilt deprived him of due process and requires a new trial. The state responds (1) that defendant waived any arguments regarding his refusal to allow the police to search his car; (2) that any error was invited because defendant testified on direct examination about his refusal to consent to a search and his attempts to contact his attorney; (3) that no constitutional error occurred because defendant's right to counsel did not attach until the state initiated formal criminal proceedings; and (4) that any error was harmless beyond a reasonable doubt, in any event. We address each of these contentions in turn.

### A. Waiver

We first reject the state's argument that defendant waived his objection to evi-

dence that he refused to consent to the warrantless search by not objecting when the first officer testified. Defendant had already moved for, and been granted, an order precluding admission of this testimony. A motion *in limine* preserves for appeal any objection therein. *See State v. Burton,* 144 Ariz. 248, 250, 697 P.2d 331, 333 (1985); *State v. Lujan,* 136 Ariz. 326, 328, 666 P.2d 71, 73 (1983). Furthermore, defendant made several objections throughout the trial to admission of this evidence. He also moved for mistrial on this basis.[5] Additionally, the issue was raised in defendant's motion for a new trial. Under these circumstances, we find no waiver on this record.

### B. Invited Error

■ The state also argues that the testimony defense counsel elicited from defendant on direct examination about his contact with his attorney "invited" the error he now alleges as a result of the state's cross-examination on this subject. In overruling defendant's objection to this evidence, the trial court concluded that the subject that defendant "consulted with counsel, and when and with whom, has become relevant because the defense has made it so."

We have previously held that the doctrine of invited error applies to a prosecutor's comments on a defendant's invocation of the fifth amendment right to remain silent as well as a defendant's invocation of his fourth amendment protections. *State v. Wilson,* 185 Ariz. 254, 258, 914 P.2d 1346, 1350 (App.1995); *see also State v. Crumley,* 128 Ariz. 302, 305, 625 P.2d 891, 894 (1981). We conclude that it is appropriate for us to review the invited error exception to the admission of otherwise inadmissible evidence in this case.

5. After the trial court denied his motion for a mistrial, defense counsel made a further comment to clarify his objection on the record:
[DEFENSE COUNSEL:] Judge, just so the record is clear, the kind of questions and the point in time we're talking about were not having to do with an afternoon phone call that was being testified to. *It had to do with the time the police arrived and were questioning my client and his assertion of his rights.* That's the time I was talking about.

■ Invited error occurs when "evidence adduced or comments made by one party make otherwise irrelevant evidence relevant or require some response or rebuttal." *Wilson,* 185 Ariz. at 258, 914 P.2d at 1350, citing *State v. Woods,* 141 Ariz. 446, 455, 687 P.2d 1201, 1210 (1984). The state argues that its elicitation of defendant's testimony about his contact with his attorney was justified by defendant's own testimony about that subject during his direct examination. However, the state fails to recognize that defense counsel's purpose in eliciting that testimony on direct examination was to explain defendant's refusal to consent to a search of his car, which the prosecution had elicited from the two police officers in its case-in-chief, in violation of the *in limine* order precluding such testimony. Under similar circumstances, involving testimony about a defendant's assertion of his right to remain silent, we have concluded that invited error did not occur:

This is a novel proposition—that the State, having deliberately created constitutional error during its case-in-chief, somehow renders that error harmless by cross-examining the defendant on the same subject. Although we can see from the record that the prosecutor's cross-examination of Appellant was in response to questions his counsel asked the backup officer regarding the meaning of the *Miranda* warnings, *the fact that Appellant's counsel asked some questions about this subject does not excuse the previous deliberate error by the prosecution.* We do not agree that the State can create deliberate constitutional error, then save the conviction by arguing that the error became harmless when Appellant's counsel asked a few questions to try to minimize the damage.

THE COURT: I'm not sure that was the time that [the prosecutor] was talking about.
[DEFENSE COUNSEL:] It did not appear to be. We approached the bench at that time. That's when you cautioned her. We then went into this new topic about what happened when the police arrived, and that's when I came up to the bench and moved for a mistrial.
(Emphasis added.) The court did not reconsider its denial of defendant's motion for a mistrial.

*State v. Keeley,* 178 Ariz. 233, 236, 871 P.2d 1169, 1172 (App.1994) (emphasis added). Likewise, in this case, defendant's testimony on direct examination did not "invite" error; it merely responded to it. His testimony about his attempts to contact his attorney was necessary to explain the state's prior evidence elicited, in violation of the *in limine* orders, of his refusal to consent to a search. Under these circumstances, we conclude that no invited error occurred that would justify the prosecution's conduct in this case.

### C. Constitutional Error

■■■ As a preliminary matter, we address the state's contention that defendant had no sixth amendment right to counsel to assert during the preliminary police investigations. We agree. *See United States v. Gouveia,* 467 U.S. 180, 189, 104 S.Ct. 2292, 2298, 81 L.Ed.2d 146 (1984) (sixth amendment right to counsel does not attach until the government initiates adversarial judicial criminal proceedings). However, defendant is not alleging a violation of his sixth amendment right to counsel in this case, nor is he alleging that his fourth amendment rights were violated by an unlawful search or seizure. Defendant's argument is that his rights to due process under the fifth and fourteenth amendments were violated by the witness testimony and prosecutorial comments concerning his contact with his attorney and his assertion of his fourth amendment rights in refusing to consent to a warrantless search.

The United States Supreme Court has found that due process is violated when a defendant's assertion of his right to remain silent is introduced at trial as evidence of his guilt, because the exercise of a constitutional right is "insolubly ambiguous." *Doyle v. Ohio,* 426 U.S. 610, 617, 96 S.Ct. 2240, 2244, 49 L.Ed.2d 91 (1976). Although the Supreme Court has not addressed whether due process is violated by admission of evidence of either a defendant's invocation of his fourth amendment right to refuse to a warrantless search or his decision to meet with counsel before his arrest, many other juris-

dictions have addressed those issues, and have found a due process violation occurs under circumstances similar to those in this case. *E.g., United States v. Thame,* 846 F.2d 200, 206 (3d Cir.) (error for the prosecutor to argue that defendant's refusal to consent to search of his bag constituted evidence of his guilt), *cert. denied,* 488 U.S. 928, 109 S.Ct. 314, 102 L.Ed.2d 333 (1988); *United States v. Prescott,* 581 F.2d 1343, 1351 (9th Cir.1978) ("passive refusal to consent to a warrantless search is privileged conduct which cannot be considered as evidence of wrongdoing"); *United States v. Taxe,* 540 F.2d 961 (9th Cir.1976) (prosecutor's comments on defendants' refusal to consent to a search of their trucks was "misconduct" but harmless under circumstances); *United States v. Rapanos,* 895 F.Supp. 165, 168 (E.D.Mich.1995) (error to insinuate that defendant's refusal to consent to warrantless entry onto his land was evidence of concealment of a crime); *Padgett v. State,* 590 P.2d 432, 434 (Alaska 1979) (right to refuse to consent to warrantless search of car "would be effectively destroyed if, when exercised, it could be used as evidence of guilt"); *Sizemore v. Fletcher,* 921 F.2d 667, 671 (6th Cir.1990) (prosecutor "may not imply that an accused's decision to meet with counsel, even shortly after the incident giving rise to a criminal indictment, implies guilt"); *United States v. McDonald,* 620 F.2d 559, 563–64 (5th Cir.1980) (constitutional error "to attempt to prove a defendant's guilt by pointing ominously to the fact that he has sought the assistance of counsel"); *United States v. Yeager,* 476 F.2d 613, 616 (3d Cir. 1973) (prosecutor's comment that defendant called his attorney the morning after the incident constitutional error).

One of the most analogous situations to the circumstances of this case was recently before the federal district court in *United States v. Rapanos,* 895 F.Supp. 165 (E.D.Mich.1995). In that case, the defendant was charged with knowing discharge of pollutants into federal wetlands. On cross-examination at trial, the prosecutor asked the defendant about his refusal to allow warrantless entry onto his land by state environmental officers:

Q: ... [A]gain, you had not let the DNR on the property?

A: [My attorney] told them just point blank, you will not be allowed on the property.

Q: And you agreed with that?

A: He said you cannot go on the property without a search warrant, I think.

. . . .

Q: Since you were certain in your own mind that there were no wetlands there, *why not let the DNR on the property?*

A: It's not my decision.

Q: *Were you practicing concealment again?*

A: *They could get a search warrant,* ... and they could go out there the next day if they wanted to . . . . They know the procedure. . . .

Q: *So you were practicing concealment, or not?*

Q: *So you weren't willing to say, don't worry, I have nothing to hide, let them on?*

A: I don't think that ever came up.

Q: All right. And as a client, you have the ability to do that; right? To say to your attorney, look, go ahead, let them on?

A: I learned a long time ago, that if you don't take your attorney's advice, you shouldn't have him . . . .

Q: So the bottom line is, though, you knew that you could talk to him about that and try to convince him to do that and you chose not to?

A: It didn't happen.

*Id.* at 167. In reversing this case for a new trial after finding "plain error," the *Rapanos*

court noted the following "troublesome" factors: first, the prosecutor's questions were not only elicited during defendant's own testimony, but insinuated an argument that defendant's refusal to consent to a warrantless entry onto his property constituted concealment of incriminating evidence. The fact that defendant was asked why he hadn't convinced his attorney to waive his fourth amendment rights was analogous to the reversible error in *Doyle v. Ohio,* where the prosecutor asked the defendant to explain his silence at the time of his arrest. *Id.* at 168. The court also found that the jury may have been overly influenced by this inference of guilt in Rapanos' case because the evidence of defendant's guilt was not overwhelming and "a reasonable jury could have rendered either verdict. . . . In such a situation, an unchecked prejudicial comment may have indeed tipped the scales in favor of conviction." *Id.* at 169. Thus, the error required reversal and a new trial. *Id.* at 170.

Additionally, this court has previously addressed the issue in *dictum. Wilson,* 185 Ariz. at 258, 914 P.2d at 1350.[6] We now address the question directly on the merits.

We can see no valid distinction between the privilege against self-incrimination and the right to be free from warrantless searches, when invoked, that would justify a different rule about inadmissibility as evidence of guilt. In *Prescott,* the ninth circuit found the assertion of these rights indistinguishable:

Because the right to refuse entry when the officer does not have a warrant is equally available to the innocent and the guilty, just as is the right to remain silent, the refusal is as "ambiguous" as the silence was held to be in *United States v. Hale* [422 U.S. 171, 176–77, 95 S.Ct. 2133, 2136–

6. The conviction in *Wilson* was otherwise reversed on the basis of an improper jury instruction. Nevertheless, we addressed the remaining issues so they would not arise at retrial, and stated:

Just as it is generally impermissible for a prosecutor to comment on a defendant's invocation of his Fifth Amendment right to silence,

*State v. Still,* 119 Ariz. 549, 551, 582 P.2d 639, 641 (1978), so it is generally impermissible to use a defendant's invocation of his Fourth Amendment protections against him, *United States v. Prescott,* 581 F.2d 1343, 1351 (9th Cir.1978).

*Wilson,* 185 Ariz. at 258, 914 P.2d at 1350.

37, 45 L.Ed.2d 99 (1975) ].... Yet use by the prosecutor of the refusal of entry, like use of the silence by the prosecutor, can have but one objective: to induce the jury to infer guilt. In the case of silence, the prosecutor can argue that if the defendant had nothing to hide, he would not keep silent. In the case of the refusal of entry, the prosecutor can argue that, if the defendant were not trying to hide something or someone ..., she would have let the officer in. In either case, whether the argument is made or not, the desired inference may be well drawn by the jury. This is why the evidence is inadmissible in the case of silence.... It is also why the evidence is inadmissible in the case of a refusal to let the officer search.

581 F.2d at 1351–52 (citations omitted). In either situation, we believe that a defendant's invocation of constitutional rights is probative of nothing except the defendant's awareness of his or her constitutional rights.

Similarly, any inference that a suspect's pre-arrest decision to contact an attorney is evidence of guilt is also unwarranted:

... A prosecutor may not imply that an accused's decision to meet with counsel, even shortly after the incident giving rise to a criminal indictment, implies guilt. Neither may she suggest to the jury that a defendant hires an attorney in order to generate an alibi, "take[ ] care of everything" or "get [his] story straight." Such statements strike at the core of the right to counsel, and must not be permitted.

*Sizemore v. Fletcher*, 921 F.2d at 671; *see also Yeager*, 476 F.2d at 616–17 (prosecutor's comment about defendant's consultation with counsel one day after incident "would appear to be directed to, and may have had the effect of, raising in the juror's minds the inference that [defendant] was, or at least believed himself to be, guilty").

We conclude that the prosecution's references to defendant's invocation of his fourth amendment rights to refuse to consent to a warrantless entry and to his contact with an attorney prior to his arrest violated defendant's due process rights to a fair trial. The state's purpose in eliciting this evidence clearly was "to induce the jury to infer guilt" from defendant's actions. *Prescott*, 581 F.2d at 1352. This purpose is plainly apparent from the egregious comments in the state's closing arguments. Regarding defendant's refusal to consent to the search, the state impermissibly argued:

Good people help the police in pursuing an investigation of this type. They don't frustrate the police by requiring them to get a search warrant to find evidence of a crime.

Regarding defendant's contact with his attorney, the state impermissibly argued:

[Defendant] called his lawyer. And you know why, because he knew he was the one who hit that boy. He knew he was involved in the death of [the victim]. He knew that there wasn't any dark car. He was concerned, at that point, about one thing, protecting himself. He was concerned about not being arrested by the police. And that's why he called his lawyer.

We conclude that these comments were highly improper in at least two respects. First, they directly violated the *in limine* order.[7] Second, they violated defendant's due process rights to a fair trial by creating an inference that defendant's invocation of constitutional rights was evidence of his guilt.

### D. Harmless Error

Having found a constitutional due process violation, we next turn to the question whether the error was of sufficient prejudice to require a new trial. Error is "harm-

---

7. We overturn convictions for prejudicial error, not to punish prosecutors for improper comments. *United States v. Mazzone*, 782 F.2d 757, 763 (7th Cir.), *cert. denied*, 479 U.S. 838, 107 S.Ct. 141, 93 L.Ed.2d 84 (1986). As noted by the *Mazzone* court, "It is better to punish the prose-cutor directly; there is no lack of direct sanctions for lawyer's misconduct, of which improper advocacy is a well-recognized species." *Id.*, citing *United States v. Young*, 470 U.S. 1, 9–10, 105 S.Ct. 1038, 1043–44, 84 L.Ed.2d 1 (1985).

less" when it can be said beyond a reasonable doubt that it did not contribute to or affect the verdict. *State v. Krone*, 182 Ariz. 319, 321, 897 P.2d 621, 623 (1995).

Some courts have held that, when the prosecution's reference to a defendant's invocation of his constitutional rights does not "strike at the jugular" of defendant's version of the events, the error is harmless. *See Stone v. Estelle*, 556 F.2d 1242, 1245 (5th Cir.1977) ("the relevant distinction to be made . . . is between a case involving an attack on a defendant's exculpatory story and an attack on his behavior subsequent to the alleged crime for which he is being tried"), *cert. denied*, 434 U.S. 1019, 98 S.Ct. 742, 54 L.Ed.2d 767 (1978). In *Stone*, for example, the court found harmless the prosecutor's comment on defendant's request to contact an attorney because it did not address the core of his defense, that the victim had been accidently, not deliberately, shot. *Id.* at 1245–46.

The central issue at trial in this case was defendant's state of mind at the time of the offenses. Defendant did not contest that his car hit the victim. However, as to the manslaughter charge, he contended he did not act "recklessly" in driving the car. *See* A.R.S. § 13–1103(A)(1). As to the charge of leaving the scene of a fatal injury accident, he contended he did not have the requisite "knowing" mental state that an accident had occurred. *See* A.R.S. § 28–661. On appeal, the state argues that, even if error, the prosecutorial comments at trial were harmless because they were not relevant to any "essential element" of these offenses, but rather were evidence only of defendant's state of mind after the offenses had already occurred. However, the context in which defendant's invocation of his fourth amendment rights and conversations with his attorney were argued in closing arguments indicates the state's intent to use this evidence to rebut defendant's defense that he did not drive recklessly and that he did not know he was involved in an accident the night of the incident. Therefore, we do not apply the *Stone* reasoning in this case to find the error harmless.

Another approach to the question of harmless error under similar circumstances is to examine a number of factors to determine whether defendant was prejudiced. First, was defendant forced to defend his invocation of constitutional rights through his own testimony? If the error occurred solely in closing comments, which the jury is advised are not evidence, the prejudice might be less. *See Rapanos*, 895 F.Supp. at 168. Second, were the comments "moderate in tone and import," and lacking significance when considered with the overall evidence? *See People v. Redmond*, 29 Cal.3d 904, 176 Cal.Rptr. 780, 783, 633 P.2d 976, 979 (1981). Third, to what degree did the remarks complained of "have a tendency to mislead the jury and to prejudice the accused?" *Sizemore v. Fletcher*, 921 F.2d at 671. Fourth, were the comments "deliberately or accidently placed before the jury?" *Id.; see also Keeley*, 178 Ariz. at 236, 871 P.2d at 1172 (to find a deliberate error harmless "would just encourage similar constitutional error in the future"); *State v. Sorrell*, 132 Ariz. 328, 330, 645 P.2d 1242, 1244 (1982) (appellate courts are reluctant to find error harmless "when it appears that the error was deliberate and willful"). Fifth, what was the strength of the proof introduced to establish defendant's guilt; was it otherwise overwhelming or was it disputed circumstantial evidence that made defendant's credibility a factor? *See Yeager*, 476 F.2d at 616–17.

Applying these factors to this case, we cannot conclude the error was harmless beyond a reasonable doubt. First, this case did not involve just a single innocuous reference by a witness to defendant's assertion of constitutional rights; rather, the subject was elicited many times through three witnesses, including defendant's own testimony. Second, the inference of guilt from this evidence was strongly argued in the prosecutor's closing comments, despite numerous prior defense objections to this evidence, and despite a pretrial *in limine* order, and could hardly be considered "moderate in tone and import." Third, the argument that defendant was guilty because he did not consent to a war-

rantless search or because he consulted an attorney certainly could mislead the jury and prejudice defendant's defense. Fourth, we can find no "accidental" placing of these facts before the jury under the facts of this case. This was a deliberate attempt by the prosecution to establish guilt at the time of the offense from defendant's constitutionally-permissible conduct after the incident. Fifth, we do not find the evidence otherwise so overwhelming in this case that we could say beyond a reasonable doubt that the error did not affect the verdict. Defendant's credibility about his state of mind on the night of the accident was a central issue to his defense. A great deal of the evidence in this case was circumstantial and conflicting. There was disputed testimony regarding the lighting, visibility, road conditions, and state of the construction site at which the incident occurred. The extent of defendant's alcohol consumption and impairment was disputed. Our review of the evidence cannot compel us to reach the conclusion that the constitutional error that occurred in this case was harmless beyond a reasonable doubt. Accordingly, we must reverse the convictions and remand this matter for a new trial.

## CONCLUSION

We conclude that the prosecutor's use of this evidence violated defendant's due process rights to a fair trial, and the error was not harmless beyond a reasonable doubt. The convictions and sentences are therefore reversed and this matter is remanded for a new trial.

SULT, P.J., and EHRLICH, J., concur.