972 P.2d 993

**STATE of Arizona, Appellee,**

v.

**Levonnie WOOTEN, Appellant.**

**No. 1 CA–CR 96–0579.**

Court of Appeals of Arizona,
Division 1, Department A.

April 30, 1998.

Redesignated as Opinion and
Publication Ordered Sept. 4, 1998.

Review Denied Feb. 23, 1999.

Grant Woods, Attorney General By Paul J. McMurdie, Chief Counsel Criminal Appeals Section, Colleen L. French, Assistant Attorney General, Phoenix, for Appellee.

Dean W. Trebesch, Maricopa County Public Defender By Garrett W. Simpson, Deputy Public Defender, Phoenix, for Appellant.

## OPINION

PATTERSON, Presiding Judge.

¶1 Levonnie Wooten appeals from his convictions and sentences on one count each of first degree murder, burglary and witness tampering. For the following reasons, we affirm.

### *FACTS*

¶2 The victim, Althea Hayes, was last seen alive on Thursday, July 22, 1993. Two days later her body was discovered in her apartment by her father. She had been shot four times with a .380 caliber handgun. Hayes was several weeks pregnant with the child of Jerrod Mustaf, a professional basketball player and Wooten's cousin. Earlier that month, Hayes had told her health care providers and others that Mustaf did not want the child and had offered to pay her $5,000 to have an abortion. Hayes indicated that she was frightened of Mustaf.

¶3 On Saturday, July 17, 1993, Wooten's girlfriend, Monique Harris, flew from her home in California to Baltimore to spend a week with Wooten. She was supposed to meet Wooten's family, and there had been some discussion of marriage. The visit was cut short, however, when Wooten announced that he and Monique were to travel to Phoenix to handle some business because he owed Mustaf a favor.

¶4 They stayed at Mustaf's house with Mustaf and Mustaf's girlfriend, Kristy Wilmont. Wilmont had also arrived in Phoenix on Wednesday night. Mustaf's other friends, Pete Reece and Jauhar Anderson, were also staying at the house. Reece flew out of Phoenix the following day.

¶ 5  On Thursday, July 22, 1993, Alphonso Taylor, who knew both Wooten and Mustaf, saw the two men on Interstate 10 in Mustaf's black Porsche, which Wooten was driving. That same afternoon, Mustaf borrowed a red Mercedes convertible from Phoenix Motor Company.  Between 2:30 and 3:00 on the afternoon of July 22, Mustaf and Wooten were seen in the Mercedes and Porsche, respectively, turning into the parking lot of Hayes' Glendale apartment complex.  At that time, Hayes was out to lunch with her best friend, Toni Evans, and returned to her apartment about 5:00 p.m.

¶ 6  While Mustaf, Wooten and Anderson were gone, Wilmont, Harris, Anderson and Dawne Joshua, Anderson's girlfriend, went to Fiesta Mall in Mesa where they met Wooten who was still driving the Porsche.  The group then returned to Mustaf's house where they had dinner.  Mustaf had also returned to the house.  At some point after dinner, Wooten left the house.  None of the occupants in the house saw him between approximately 8:30 p.m. and 10:00 or 10:15 p.m.

¶ 7  At 9:23 p.m., Hayes placed a telephone call to her friend, Toni Evans.  Hayes told Evans that Mustaf's cousin "Vonnie" was at Hayes' apartment "so if anything happens to me you know who was here."  Around 9:30 p.m., Hayes' neighbors heard what sounded like gunshots or firecrackers.

¶ 8  At approximately 10:00 p.m., Harris, who had been napping in a bedroom in Mustaf's house, awoke and decided to look for Wooten.  She went to the living room and asked Mustaf and Wilmont where Wooten was.  Mustaf replied that Wooten went out to handle some business.[1]  Harris returned to the bedroom.

¶ 9  Around 10:15 p.m., Joshua, who was studying upstairs, saw Wooten near Mustaf's gun closet.  Wooten was wearing dark clothing.  At 10:30 p.m., Harris, after hearing a door close, went back to the living room and saw Wooten wearing black clothes, a black knit hat and black gloves.

¶ 10  Wooten entered the bedroom and told Harris to pack because they were leaving to return to her home in California.  She and Wooten left the house driving the Diamante that Anderson had rented.  On the way to California, while Harris was driving, she saw Wooten disassemble a handgun and throw pieces of the gun out of the car window.  Wooten returned to Phoenix on Saturday, July 24.  Mustaf and Wilmont took Wooten to a mall, where Mustaf bought Wooten a new suit and then they took Wooten to the airport.

¶ 11  On July 26, 1993, Wooten returned a call from Glendale Police Detective Lowe.  Wooten denied knowing Hayes and refused to tell Lowe where he was.  Eventually Wooten admitted that he may have met Hayes before.  Wooten initially told Lowe that he had flown into Phoenix on Thursday evening, but later told him that he had flown in on Wednesday.  He told Lowe that he and Harris had arranged to travel to Phoenix so that she could see her cousin, who played for the Arizona Cardinals.

¶ 12  Wooten told Detective Lowe that he had purchased the airline tickets from Washington to Phoenix using his own frequent flyer miles, but then stated that Mustaf had paid for the tickets and that he had reimbursed Mustaf.  When Lowe asked Wooten when he had paid Mustaf back, Wooten indicated that he had not paid Mustaf back yet, but that he planned to.  Wooten had no idea, however, how much the tickets cost.

¶ 13  Wooten told Lowe that he and Harris had left Phoenix about 3:00 p.m. on Thursday and drove to California in the Diamante.  He told Lowe that he had returned to Phoenix on Saturday morning.  Wooten first denied ever driving the black Porsche, but later stated he had driven it to a grocery store on Wednesday night, July 21, 1993.  Wooten told Lowe that he had not been apart from Harris at any time during the trip, except when he went to the grocery store on Wednesday evening.  Wooten denied driving the Porsche on Thursday and denied ever receiving any money from Mustaf.

¶ 14  About one week after the murder, Wooten called Harris and told her that if the police asked she was to tell them that they

---

1.  At trial, Wilmont denied that this discussion took place.

had left Phoenix for California at 2:00 or 3:00 in the afternoon on Thursday, July 22, the day that Hayes was killed. He also instructed her to say that they had traveled to Phoenix to visit Harris' cousin. During the conversation, Harris took notes on a piece of cardboard that was eventually recovered by police.

¶ 15 The police investigation revealed that Wooten had lied. Harris' cousin had been out of town. The people who were at Mustaf's house on Thursday afternoon and evening refuted Wooten's claim that he left at 3:00 p.m. Although Harris told investigators on more than one occasion the story that Wooten had instructed her to tell, she eventually broke down and admitted lying for Wooten. Other sources reported that Wooten and Hayes knew each other.

¶ 16 Wooten was charged with murder, burglary, and witness tampering. He was arrested in Maryland and returned to Arizona. The case was tried to a jury in January 1996. The state theorized that Mustaf wanted Hayes killed because she refused to abort her baby, and that Mustaf had induced Wooten to carry out the killing.

¶ 17 Wooten's attorney contended that the police had failed to follow a number of leads that suggested the possibility that someone else had committed the killing, and argued that many of the state's witnesses were not credible. The defense did not dispute Mustaf's motive to kill Hayes, but claimed that he "set up" Wooten. Defense counsel contended that Mustaf had enlisted someone other than Wooten to commit the crime. Wooten did not testify.

¶ 18 The jury found Wooten guilty on all three counts of the indictment. After an aggravation/mitigation hearing, the trial court sentenced Wooten to "natural life" on the first degree murder count, an aggravated term of twenty-one years on the burglary count, and an aggravated term of 1.87 years on the witness tampering count. Wooten timely appealed from his convictions and sentences.

**2.** Wooten implies that the state purposefully misrepresented to the trial court the anticipated

### ISSUES

¶ 19 The issues are as follows:

I. Did the jury commissioner's "shunting away" of prospective jurors because they indicated they could not serve on a lengthy trial violate Wooten's Sixth Amendment right to a jury panel made up of a fair cross-section of the community or his rights to equal protection and due process?

II. Did the trial court err in precluding Wooten's "third-party" defense?

III. Did the trial court err in admitting evidence of the victim's telephone call, identifying Wooten, under the present sense impression and residual exceptions to the hearsay rule?

IV. Did the trial court err in precluding introduction of "self-serving" hearsay statements by Wooten denying responsibility for the murder?

V. Did the trial court err in allowing the State to introduce excerpts of Wooten's tape-recorded telephone calls made from the jail?

VI. Did the trial court err in denying Wooten's request for a *Willits* instruction?

VII. Is the statute allowing the imposition of a "natural life" sentence for first degree murder unconstitutional?

### ANALYSIS

**I. "Shunting Away" of Prospective Jurors**

¶ 20 In anticipation of a lengthy trial in this case, the jury commissioner prescreened prospective jurors before voir dire. Those indicating to the commissioner that they would be unduly burdened by lengthy service were excused. On appeal, Wooten argues that the jury commissioner's prescreening of prospective jurors disproportionately excluded poor and minority panelists, thereby depriving Wooten of his right to a jury composed of a fair cross-section of the community and violating his Sixth Amendment right to a fair trial as well as his rights to equal protection and due process under the Fourteenth Amendment.[2]

length of the trial to seat a jury more favorable to its case. The record does not support his claim.

## A. Fair Cross–Section and Equal Protection

¶ 21 The selection of a jury from a representative cross-section of the community is an essential component of a criminal defendant's Sixth Amendment right to an impartial jury. *Taylor v. Louisiana*, 419 U.S. 522, 528, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). "In order to establish a *prima facie* violation of the fair cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that the underrepresentation is due to systematic exclusion of the group in the jury selection process." *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979).

¶ 22 Wooten's claims are nearly identical to those raised in *State v. Atwood*, 171 Ariz. 576, 832 P.2d 593 (1992). In that case, the defendant claimed that persons not employed by larger corporations with policies of compensating their employees for jury duty were excluded from the jury pool. *Id.* at 622–23, 832 P.2d at 639–40. On appeal, our supreme court held that the defendant had failed, either for purposes of a fair cross-section claim under *Duren* or for purposes of an equal protection claim, to identify a distinctive group. *Id.* at 623, 832 P.2d at 640.

¶ 23 Wooten has likewise failed to establish that a cognizable group was excluded. Under *Atwood*, those seeking exclusion from service due to economic hardship do not constitute a distinctive group within the community. Wooten's contention that those likely to claim hardship are disproportionately poor or racial minorities is purely speculative.

¶ 24 Wooten has failed to satisfy the other two prongs of *Duren* as well. Although he identifies thirteen minority members among the seventy-eight to ninety-four

persons who were excused, he has offered no statistical evidence to demonstrate that any identifiable group was underrepresented in the venire from which the jury was selected. *Cf. State v. Sanderson*, 182 Ariz. 534, 538, 898 P.2d 483, 487 (App.1995) (comparing percentage of Native Americans in venire from which jury was selected with proportion in population of county). *See also Atwood*, 171 Ariz. at 623, 832 P.2d at 640 (noting defendant had failed, for purposes of equal protection claim, to establish underrepresentation by comparing proportion of group in total population to proportion called to serve as jurors). Nor has Wooten shown that systematic exclusion of any group resulted from the selection process employed.

## B. Due Process

¶ 25 Wooten also contends that the procedure violated state law and therefore constituted a *per se* due process violation requiring reversal of his conviction. He concedes that the jury commissioner is statutorily empowered to excuse prospective jurors from service. Section 21–315 provides:

> Where a person's answers to a questionnaire indicate that he is unqualified for jury service or, in the opinion of the jury commissioner, state grounds sufficient to be excused from jury service, his name shall not be included on the qualified juror list and he shall be notified that he is excused from service.

Ariz.Rev.Stat. Ann. (A.R.S) § 21–315 (Supp. 1997). Wooten contends, however, that the statute does not permit the jury commissioner to excuse jurors, once summoned, from service based upon an unsworn "show of hands" that they would be unable to serve on a lengthy trial without voir dire by the court and counsel.

¶ 26 Again, we find *Atwood* dispositive of Wooten's claim. On appeal, Atwood argued that the jury commissioner's staff had improperly excluded prospective jurors who had claimed undue hardship, including those

---

Indeed, Wooten's counsel told the court that the trial would likely take longer than the state estimated. Although the state ultimately called only a fraction of the witnesses it had listed, we know of no requirement that a party call all or even most of the witnesses it has disclosed. Such a rule would likely encourage litigants to either "underlist" witnesses, thereby risking preclusion of important evidence, or to offer unnecessarily cumulative evidence.

responsible for caring for young children or the elderly. 171 Ariz. at 623, 832 P.2d at 640. The supreme court rejected the defendant's claim, noting the broad discretion afforded the jury commissioner's office and concluding that nothing in the record indicated that the jury selected from the remaining pool fell short of the requisite standards of fairness and impartiality. *Id.; see also State v. Murray,* 184 Ariz. 9, 23, 906 P.2d 542, 556 (1995) (noting that, absent separate showing of prejudice or discrimination, failure to follow statutory procedures for jury selection is considered harmless).

¶ 27 Wooten's reliance on our recent decision in *State v. Shone,* 190 Ariz. 113, 945 P.2d 834 (App.1997) is misplaced. In that case, the trial court improperly denied defense counsel's request to voir dire the jury panel, in violation of Rule 18.5(d) of the Arizona Rules of Criminal Procedure. *Id.* at 114–15, 945 P.2d at 835–36. As amended, that rule requires that the court allow a party requesting voir dire reasonable time to conduct an examination. We reversed Shone's conviction under a harmless error analysis because the trial court's action resulted in the seating of a potentially biased juror. *Id.* at 116, 945 P.2d at 837.

¶ 28 In Wooten's case, the persons excused by the jury commissioner ceased to be prospective jurors. Thus, there was no need to allow defense counsel to conduct voir dire, the purpose of which is to identify those who should be *excluded* from the jury. *See State v. McDaniel,* 136 Ariz. 188, 192–93, 665 P.2d 70, 74–75 (1983) (purpose of voir dire is to unveil juror's prejudice so parties can exercise intelligent peremptory and causal strikes). Wooten has not demonstrated, nor even alleged, that the jury selected in this case was biased. Reversal is not warranted.

## II. Preclusion of "Third–Party" Defense

¶ 29 The State filed a motion in limine to preclude introduction of certain evidence and argument that someone other than Wooten was the killer.[3] The trial court granted the state's motion, citing *State v. Fulminante,* 161 Ariz. 237, 252, 778 P.2d 602, 617 (1988), which provides that "before a defendant may introduce evidence that another person may have committed the crime, the defendant must show that the evidence has an inherent tendency to connect such other person with the actual commission of the crime." The court ruled, however, that Wooten could introduce evidence that Mustaf had brought friends in to provide himself with an alibi.

¶ 30 Wooten claims that the ruling denied him his Sixth Amendment right to put on a defense and constituted unconstitutional fact-finding by the trial judge. However, he concedes that much of the evidence in question was admitted despite the trial court's ruling on the third-party defense. Wooten does not identify with particularity the evidence that he believes was improperly excluded. Nor does he claim that the evidence he wished to present satisfied the "inherent tendency" test as described in *Fulminante.* Rather, he argues that the test itself unconstitutionally bars defense evidence and argument.

¶ 31 Wooten claims that any standard for admission of defense evidence that exceeds relevancy obstructs a citizen's constitutional right to put on a defense. However, "[t]he accused does not have an unfettered right to offer [evidence] that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Taylor v. Illinois,* 484 U.S. 400, 410, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988) (holding that the Compulsory Process Clause of the Sixth Amendment does

---

**3.** In response to the state's motion, Wooten identified the following evidence and argument as "third-party" evidence: (1) that Pete Reece could have killed Hayes because the police had failed to adequately verify that Reece had departed Phoenix before the killing; (2) that Hayes' neighbor had seen three black males entering and exiting Hayes' apartment on numerous occasions including the night before and morning after the killing; (3) that Max Etienne, a friend of Mustaf's from New York, called Mustaf on the night Hayes was killed; (4) that Frank Simone, who operated a limousine service, received a call from Mustaf on or about the night of the murder asking that Simone pick someone up at the airport; (5) that an old gray car was seen leaving Hayes' apartment complex with its lights off on the night of the killing; and (6) that an associate of Mustaf's had once threatened a man with a gun. Evidence of all but the final matter listed was admitted, primarily in support of Wooten's theory that the police had failed to adequately follow up various investigative leads.

not create a complete bar to the preclusion of defense witnesses for discovery violations). *See also Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) (noting judges retain wide latitude under Confrontation Clause to impose reasonable limits on cross-examination); *Montana v. Egelhoff,* 518 U.S. 37, 116 S.Ct. 2013, 2017, 135 L.Ed.2d 361 (1996) (rejecting as "indefensible" proposition that Due Process Clause of the Fourteenth Amendment requires admission of all relevant evidence offered by defendant).

■ ¶ 32  Under Rule 402 of the Arizona Rules of Evidence, only relevant evidence may be admitted. Evidence is relevant if it has a tendency to make the existence of any fact that is of consequence to the case more or less probable than without the evidence. Ariz. R. Evid. 401. Relevant evidence may be excluded if its probative value is substantially outweighed by danger of unfair prejudice, confusion of issues, misleading the jury, or undue delay. Ariz. R. Evid. 403. We agree with the state that the "inherent tendency" test is little more than the application of these rules to that category of evidence that can be classified as "third-party defense" evidence.[4] *See, e.g., State v. Williams,* 133 Ariz. 220, 230–31, 650 P.2d 1202, 1212–13 (1982) (applying inherent tendency test to uphold trial court's Rule 403 determination). The inherent tendency test does not necessarily violate a defendant's right to present a defense. *See State v. Oliver,* 158 Ariz. 22, 30, 760 P.2d 1071, 1079 (1988) (Sixth Amendment right to present

evidence is limited to relevant and not unduly prejudicial evidence).

■ ¶ 33  We also reject Wooten's claim that, because some of the evidence he sought to introduce was admitted, he had a constitutional right to argue that the evidence established third-party culpability. Although a defendant may argue any reasonable inference supported by the evidence, because the evidence did not have an inherent tendency to establish that someone else committed the crime, Wooten's counsel could properly be precluded from pointing the finger of suspicion at a particular individual.

¶ 34  Moreover, Wooten's trial counsel took every opportunity to exploit the alleged failures of the police to follow up various "leads." In doing so, she implicitly communicated to the jury the theory that someone other than Wooten committed the crime. Defense counsel expressly argued that Wooten had been "set up" by Mustaf,[5] and speculated that Wooten was at Mustaf's house having sex with Harris at the time Hayes was killed. We discern no prejudice from the preclusion of argument identifying a particular person as the killer, absent evidence inherently connecting someone other than Wooten to the actual shooting.[6]

### III. Victim's Identification of Wooten

■ ¶ 35  Wooten next complains that the court erred in admitting evidence of Hayes' telephone call to Toni Evans, in which she claimed that Wooten was present at her apartment. Wooten argues that the trial court erred in admitting the statements under the present sense impression and residual exceptions to the hearsay rule[7], and that

4.  We decline, however, the state's invitation to urge trial courts to abandon the inherent tendency doctrine, and to instead rely solely upon Rules 401 and 403 in considering evidence of third-party culpability. In order to do so, we would effectively have to disregard or overturn a number of Arizona Supreme Court opinions, including *Fulminante.* We lack the authority to do so. *Bade v. Arizona Dep't of Transp.,* 150 Ariz. 203, 205, 722 P.2d 371, 373 (App.1986).

5.  For example, defense counsel argued that Hayes had identified Wooten as the person at her door because Mustaf had called Hayes approximately forty minutes before the killing and falsely told her that Wooten was on his way. Although evidence was introduced that a call had been

placed to Hayes from Mustaf's cellular phone, there was no evidence as to who placed the call or the substance of the conversation.

6.  In fact, at the hearing on the state's motion, defense counsel informed the court that "I don't really intend to say that anybody committed this crime. That is not my job. That is [the prosecutors'] job."

7.  The residual or "catch-all" exception applies to a statement not specifically covered by any other exception, but having equivalent circumstantial guarantees of trustworthiness. The exception applies if the statement is offered as evidence of a material fact, is more probative on the point for which it is offered than any other evidence,

as a result he was deprived of his right to confront and cross-examine witnesses. Absent a clear abuse of discretion, we will not overrule a trial court's evidentiary findings. *Oliver*, 158 Ariz. at 30, 760 P.2d at 1079.

## A. Present Sense Impression Exception

¶ 36  A present sense impression, admissible as an exception to the general prohibition against hearsay, is "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." Ariz. R. Evid. 803(1). Wooten claims that the trial court erred in concluding that Hayes' statement to Evans was a present sense impression because there was no indication that Hayes was perceiving Wooten at the time the statement was made.

¶ 37  Wooten's argument is premised on the absence of nearby windows or peephole in the door of the victim's apartment. He contends that, because there was no evidence that Hayes had actually seen the person at the door, the showing was insufficient that her identification of Wooten was based upon her actual perception.

¶ 38  Testimony at trial indicated that Hayes was perceiving Wooten when she called Evans. Todd Armstrong lived in the apartment next to Althea Hayes. At about 9:30 on the evening that Hayes was killed, Armstrong heard someone knocking on the door of Hayes' apartment. He heard a man's voice demanding to be let in and he could hear Hayes' voice coming from inside the apartment. Armstrong heard Hayes open the door and say, "I haven't seen you in a long time."

¶ 39  Renaldo Verdugo lived in the apartment above the victim's. He heard someone banging on Hayes' door say "It's an old friend. Let me in." A short time later, Verdugo heard a female voice say, "Oh, I haven't seen you in a long time." Further, evidence showed that Hayes and Wooten knew each other through Mustaf.

¶ 40  This case is unlike *State v. Koch*, 138 Ariz. 99, 673 P.2d 297 (1983), upon which Wooten relies. In that case, the declarant gave the police a description of a suspect two days after the victim's body was discovered. *Id.* at 103, 673 P.2d at 301. The court held that the declarant's statements describing the suspect did not constitute present sense impressions because the declarant was not relating the description while he was perceiving the suspect or immediately thereafter. *Id.* at 104, 673 P.2d at 302.

¶ 41  In this case, Hayes' statement itself, combined with the testimony of her neighbors, provided adequate indication that Hayes was perceiving Wooten to support the trial court's decision to admit the evidence. *See United States v. Portsmouth Paving Corp.*, 694 F.2d 312, 323 (4th Cir.1982) (for purposes of present sense impression, "[w]e perceive events with our ears as much as with our eyes"). Hayes' purported inability to visually identify Wooten went to the weight to be given the evidence, not to its admissibility.

## B. Confrontation Clause

¶ 42  The rule precluding hearsay statements and the Confrontation Clause serve similar interests. However, the Supreme Court has been careful not to equate the two. *Idaho v. Wright*, 497 U.S. 805, 814, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990). Thus, even though admissible under an exception to the hearsay rule, a statement may be inadmissible under the Confrontation Clause. *Id.* The right to confrontation and examination, however, is not absolute. *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). In order for a hearsay statement to be admitted under the Confrontation Clause, the declarant must be unavailable and the statement must bear adequate "indicia of reliability." *Id.* If the statement falls within a "firmly-rooted" exception to the hearsay rule, reliability may be inferred and no further showing of reliability need be

and if the general purposes of the hearsay rules and the interests of justice are served by admission. Ariz. R. Evid. 803(24). Because we agree with the trial court that the statement qualified as a present sense impression, we need not consider the trial court's alternative ruling that the statement fell within the residual hearsay exception, or whether additional particular guarantees of trustworthiness existed under *Roberts*.

made. *Bourjaily v. United States,* 483 U.S. 171, 183, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987). If, on the other hand, the applicable exception is not firmly-rooted, there must be particular guarantees of trustworthiness before the statement may be admitted. *Roberts,* 448 U.S. at 66, 100 S.Ct. 2531.

¶ 43 Hayes' statements to Evans fell within the firmly-rooted present sense impression exception to the hearsay rule. *State v. Savant,* 146 Ariz. 306, 308, 705 P.2d 1357, 1359 (App.1985) (statements meeting firmly rooted hearsay exceptions are sufficiently reliable to avoid confrontation difficulties). Therefore, the admission of the statement did not violate Wooten's right to confrontation.

### C. Second Portion of Hayes' Statement

¶ 44 Wooten also argues that, even if that portion of Hayes' statement identifying him was admissible, Hayes' explanation as to why she was calling Evans was not. In order to qualify under the present sense impression exception, a statement must describe or explain an event or condition. Ariz. R. Evid. Rule 803(1). We conclude that Hayes' expression of concern for her safety was sufficiently tied to the event of Wooten's appearance at her door to constitute an "explanation" for purposes of Rule 803(1).[8]

### D. Relevance

¶ 45 We also reject Wooten's contention that the statements were irrelevant and unfairly prejudicial. The identity of the killer was the only seriously disputed issue at trial. Hayes' identification, while certainly "prejudicial" in the sense that it was incriminating, was the only evidence directly placing Wooten at the murder scene at the time of the crime. As such, it was highly relevant. The trial court did not abuse its discretion in determining that the probative value of the statements outweighed the risk of unfair prejudice.

### IV. Preclusion of "Self–Serving" Hearsay Statements by Wooten

¶ 46 At trial, the state called Alphonso Taylor, who testified that he had seen Wooten driving Mustaf's black Porsche on the day of the murder. On cross-examination, Taylor testified to a subsequent telephone conversation he had with Wooten wherein Wooten apparently denied responsibility for the killing. The state objected that the proposed testimony was hearsay. The trial court sustained the objection.

¶ 47 On appeal, Wooten argues that evidence is not rendered inadmissible simply because it is "self-serving." Wooten misunderstands the trial court's ruling. The judge noted the self-serving nature of the evidence. However, he was merely distinguishing between a party's statement offered by an opponent, which is not hearsay, and a party's exculpatory statement offered by the declarant. The statement offered by declarant is inadmissible unless it falls within a recognized exception to the hearsay rule. *See* Ariz. R. Evid. 801(d)(2) (admission by party-opponent is not hearsay); *State v. Barger,* 167 Ariz. 563, 566–67, 810 P.2d 191, 194–95 (App.1990) (holding inadmissible defendant's self-serving, exculpatory statements). The proposed testimony was clearly inadmissible hearsay.

¶ 48 Wooten also suggests that his Sixth Amendment right to confrontation was violated and that he was denied due process because exclusion of the hearsay statement improperly precluded him from explaining "impeaching material" and let "out-of-context evidence be unleavened by the explanatory contents" of the statement. This argument is without merit. Wooten's trial counsel indicated that she wished to use her client's denial to Taylor to "impeach" *Harris'* claim that Wooten had admitted involvement in the

---

8. Hayes' prediction of her fate was independently admissible, not for the truth of the matter asserted, *i.e.,* that harm would befall her, but as evidence of her fear of Wooten and Mustaf. As such, the statement was not hearsay under Rule 801(c) of the Arizona Rules of Evidence, and was relevant to the issue of motive. Without deciding the issue, we also question the trial court's conclusion that Hayes' expression of concern for her well-being did not qualify as a "state of mind" exception to the hearsay rule. *See* Ariz. R. Evid. 803(3).

crimes. However, defense counsel made no showing that the two conversations were in any way related. Furthermore, Wooten's denial of involvement in the killing in a subsequent telephone conversation had nothing to do with Taylor's observations of Wooten and Mustaf in the Porsche. Thus, there was no "out-of-context" evidence to explain. We find no error.

## V. Tapes of Wooten's Telephone Calls From the Jail

¶ 49 At trial, the state played a single tape containing excerpts taken from the recordings. The state's purpose in playing the tapes was to demonstrate Wooten's connection to Mustaf. A number of the calls were to Mustaf and Mustaf's family and friends, most notably Mustaf's father, who apparently was involved in helping to secure defense counsel for Wooten. The state argued that the tapes demonstrated that Mustaf was funding Wooten's defense, and as such, were relevant to the overall theory of cooperation between Mustaf and Wooten. The tapes also recorded Wooten's comments about various witnesses and evidence.

### A. Disclosure

¶ 50 During the period of time that Wooten was incarcerated pending trial, over two hundred of his telephone calls were tape-recorded by the Maricopa County Sheriff's Department. Detective Hawkins of the Glendale Police Department obtained copies of all tape recordings. However, the original tapes were "recycled." Thus, Wooten was prevented from reviewing the original tapes prior to trial. However, the state provided his attorney access to all of the duplicate recordings that the state indicated it might offer as evidence.

¶ 51 Wooten argues that the trial court should have precluded the tapes because their disclosure was untimely and prejudicial. He contends that the state never provided his attorney with access to the original recordings and did not give him the final edited version of the excerpts the state intended to play until the day the state presented it to the jury. Thus, he could not match the excerpts with the complete statements from which they came.

¶ 52 Wooten's claim of untimely disclosure is unsupported by the record. The record reflects that in April 1995, over eight months before trial, the state disclosed its intent to use the tapes of Wooten's calls, noting that the evidence was voluminous and that it would provide copies of the tapes to defense counsel. The state began disclosure of the tapes to Wooten in May 1995. The defense team copied a number of the tapes over the course of the summer of 1995. The last of the tapes was disclosed to the defense in December 1995.

¶ 53 On September 8, 1995, Wooten filed a motion to require the state to list the tapes it actually intended to use at trial and to provide copies of transcripts that it intended to introduce. The court granted that motion, ordering the state to provide the list and copies of transcripts at least thirty days in advance of trial, absent extraordinary circumstances. On January 3, 1996, the court ordered the state to provide Wooten with copies of any remaining tapes that the state did *not* intend to use by 3:00 p.m. the following day. The state complied with the orders.

¶ 54 The state contends, and Wooten does not dispute, that four days before trial began, the trial court heard argument and ruled on the state's motion in limine to admit certain of the conversations. Nor does Wooten dispute that, on the day the trial began, the court listened to the excerpts that the state wished to play, and ordered further editing. Thus, while some excerpts were excised from the final version of the tape just prior to the tape's introduction, defense counsel did have prior notice as to what would be introduced. The state's failure to offer at trial all the evidence it has disclosed is not a disclosure violation.

¶ 55 Wooten's contention that he could not have introduced the complete statements from which the excerpts came is not supported by the record. In fact, the trial court expressly indicated to defense counsel that it would permit her to introduce any statements necessary to complete the statements that were introduced. Defense counsel took

advantage of the court's offer and, as to some of the excerpts, introduced more complete statements. At no time did defense counsel request additional time to prepare her own tape or to introduce additional statements. Nor does the record indicate that she was precluded from doing so.

## B. Foundation

¶ 56 Wooten next contends that the tape lacked foundation because the prosecution presented no chain of custody establishing that the original tapes had not been altered or that the copies were true and correct when compared to the original. Detective Hawkins conceded that he did not listen to the original tapes, but rather monitored copies of the original tape that had been made by others. He testified that all inmate calls are recorded onto a microcomputer master tape. To listen to the tape, the recording must be transferred from the microcomputer tape to regular cassette tape, and at that point the calls are monitored. The conversations of a particular inmate are located by a "pin" number that the inmate must enter at the time he makes the call. Hawkins located tapes of Wooten's calls by pin number and listened to copies of each of his conversations. Hawkins was also able to identify most of the parties to the calls. He had met Wooten and many of the other people involved and recognized their voices and many of the callers identified themselves by name.

¶ 57 The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims. Ariz. R. Evid. 901(a). Circumstantial evidence may be used to prove the authenticity of a sound recording. *State v. Lavers*, 168 Ariz. 376, 388 n. 8, 814 P.2d 333, 345 n. 8 (1991). The question for the trial judge is not whether the evidence is authentic, but only whether evidence exists from which the jury could reasonably conclude that it is authentic. *Id.* at 386, 814 P.2d at 343.

¶ 58 The trial court did not abuse its discretion in admitting the tape recordings in question. The evidence as to the process used to copy the tapes did not suggest that the tapes were tampered with or that they were not what they were reported to be. That Detective Hawkins did not personally listen to each of the original tapes does not *per se* render the copies suspect. Under the circumstances, the foundation was sufficient to support the trial court's ruling.

¶ 59 Wooten also argues that the excerpted version of the tapes admitted by the state precluded him from introducing his complete statements under Rule 106 of the Arizona Rules of Evidence. However, defense counsel did place the excerpted portions of some of Wooten's statements into context. Wooten cannot claim that the state's failure to play the statements in their entirety violated his rights.

## C. Right to Counsel

¶ 60 Wooten claims that the admission of the tape recordings punished him for exercising his right to counsel, and thus deprived him of a fair trial. He contends that the state introduced the tapes to show that he was guilty because he was anxious to hire an attorney. At no time, however, did the prosecutor make that argument. Accordingly, Wooten's reliance on *State v. Palenkas*, 188 Ariz. 201, 933 P.2d 1269 (App.1996), is misplaced.

¶ 61 In *Palenkas*, the prosecutor elicited evidence of the defendant's pre-arrest contact with his attorney to induce the jury to infer guilt. *Id.* at 212, 933 P.2d at 1280. Here, the evidence was admitted to show that Mustaf was assisting Wooten in obtaining an attorney as a way to protect himself. As such, the evidence was relevant to show Wooten's only connection to Hayes through Mustaf. Wooten was not punished for exercising his right to counsel.

## VI. Refusal to Give a *Willits* Instruction

¶ 62 Wooten claims that he was entitled to a jury instruction based on *State v. Willits*, 96 Ariz. 184, 393 P.2d 274 (1964), because the state failed to preserve the original recordings of his telephone calls from the jail. A trial court's denial of a requested

*Willits* instruction is reviewed for an abuse of discretion. *Murray,* 184 Ariz. at 33, 906 P.2d at 566. To receive a *Willits* instruction, a defendant must show that the state failed to preserve obviously material evidence that might exonerate him, and that the failure actually prejudiced the defendant. *State v. Perez,* 141 Ariz. 459, 464, 687 P.2d 1214, 1219 (1984).

 ¶ 63 Wooten made no showing that the original tapes contained exculpatory evidence. He argues that he was effectively prevented from doing so by the destruction of the tapes. We recognize that, in certain circumstances, the destruction of the evidence at issue may have such an effect. However, such circumstances are not present in this case. Wooten was a party to each of the conversations in question. Accordingly, he was in a position to know whether or not any exculpatory information had been excluded from the copies. *See State v. Rienhardt,* 190 Ariz. 579, 584, 951 P.2d 454, 459, 259 Ariz. Adv. Rep. 28, 31 (1997)(rejecting defendant's claim that he could not specify prejudice he suffered because letters, which defendant had written, were not part of trial record). Nevertheless, he did not indicate to the trial court, nor does he explain on appeal, what material would have been preserved on the original tapes that did not also appear on the copies. Because Wooten failed to make the requisite showing of prejudice, the trial court did not abuse its discretion in refusing to give the instruction.

## VII. Constitutionality of Natural Life Sentence

¶ 64 Finally, Wooten challenges the constitutionality of A.R.S. section 13–703, which controls sentencing in first degree murder cases.[9] Our recent holding in *State v. Guytan,* 192 Ariz. 514, 968 P.2d 587, 266 Ariz. Adv.Rep. 10 (App.1998) disposes of this issue. In that case, we found that the absence of statutory guidelines to channel a trial court's discretion in choosing between life and natural life sentences does not render the statute

unconstitutional. *Id.* 192 Ariz. at 523–524, 968 P.2d at 596–597, 266 Ariz.Adv.Rep. at 14–15. Thus, Wooten's challenge to the constitutionality of A.R.S. section 13–703 is without merit.

### CONCLUSION

¶ 65 For all of the above reasons, Wooten's convictions and sentences are affirmed.

JON W. THOMPSON, and PHILIP E. TOCI, JJ., concur.

---

9. The trial judge in this case made detailed findings regarding aggravating and mitigating circumstances as part of his consideration of whether the death penalty was warranted. Wooten

does not challenge the trial court's findings in this respect. Indeed, he claims that the sentencing scheme is unconstitutional "despite the conscientiousness displayed by this trial judge."