**STATE of Iowa, Plaintiff–Appellee,**

v.

**Christina Lorraine THOMAS,
Defendant–Appellant.**

No. 08–0052.

Court of Appeals of Iowa.

April 8, 2009.

Mark C. Smith, State Appellate Defender, and Patricia Reynolds, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Thomas W. Andrews, Assistant Attorney General, Michael J. Walton, County Attorney, and Kelly Cunningham, Assistant County Attorney, for appellee.

Heard by SACKETT, C.J., and POTTERFIELD and MANSFIELD, JJ.

POTTERFIELD, J.

Christina Thomas appeals from judgment and sentences entered upon her convictions for possession of a controlled substance with intent to deliver, child endangerment, and delivery of a controlled substance. She contends the trial court erred in admitting evidence that she refused consent to search her home after arrest; that trial counsel was ineffective in not arguing the admission of her refusal to consent denied her a fair trial; that the court erred in allowing hearsay evidence; and that there was insufficient evidence to sustain the child endangerment conviction. With respect to the drug convictions, we conclude the trial court abused its discretion in allowing into evidence repeated testimony and argument concerning Thomas's refusal to consent to a search of her residence. However, we conclude the alleged hearsay evidence was merely cumulative and there was sufficient evidence to sustain the child endangerment conviction.

## I. Background Facts and Proceedings

At about one o'clock in the morning on July 10, 2007, Benji Engesser awoke to knocking on his front door. When he answered the door, he found a boy who was about three years old. Engesser recognized the child, who had recently moved into his Davenport neighborhood. The boy told Engesser, "I want my mommy. I miss my mommy." Engesser got dressed and walked with the boy to his house. Engesser found the screen door closed, but the inside door wide open. He knocked on the screen door, yelled, and walked around the house, but saw no one and heard no response. Engesser re-

turned to his home with the boy and called the police.

Police officers Randy Gard and Eric Gruenhagen arrived and spoke with Engesser. The officers walked to the boy's house and yelled, but, like Engesser, heard no response from within.

While the officers were there, a truck[1] pulled up outside the boy's house. Christine Thomas got out of the passenger side and the truck left. Thomas approached the officers and identified herself as the boy's mother. The officers explained that her child had been out wandering by himself. Thomas seemed concerned and told the officers she had left the boy with her mother, Karla Kosgard, while she went to the boat to gamble. She told the officers her mother had recently had a medical procedure and a change of prescription. Thomas expressed concern that her mother's mental status might have been altered by those changes.

Officer Gard called the dispatcher and asked that they check local hospitals for possible news of Kosgard. Thomas and the boy went into their residence. The officers were outside on the sidewalk when two women, Julia Sird and Lisa Woods, arrived in Woods's car. The officers apparently knew Woods as a person who monitored a police scanner. Woods had heard law enforcement communications about Kosgard and telephoned Sird, who was Kosgard's sister.

After speaking with the officers, Woods and Sird drove away. Sird telephoned Kosgard at her home in Moline, Illinois. She told Kosgard that the police were at Thomas's residence, that Thomas's son had been walking down the street by himself, and that the officers had been told that Kosgard was baby-sitting and had left the boy home alone.

Woods and Sird continued to monitor radio transmissions on the police scanner. Within minutes of speaking with Kosgard, the two women heard a report on the scanner that Kosgard was in the area of a nearby Walgreen's. The two women went to the Walgreen's and found police there waiting for Kosgard. Sird informed police she had just spoken with Kosgard, who was in Moline.

The officers returned to watch Thomas's residence. Thomas was outside in her yard. The same truck in which Thomas had arrived earlier, pulled up to the curb near Thomas's house. This time it was Kosgard who got out of the passenger side and went into the residence. Thomas walked up to the passenger-side window and leaned in.

After Thomas went back inside her home, Officer Gard approached the driver, Roy Caskey, and asked him to get out of the truck. The officer noticed that Caskey had something in his hand. Caskey showed him a $10 bill wrapped around a rock of crack cocaine, and told the officers Thomas had given it to him for driving her around.

Officer Gard then spoke with Kosgard and determined that the boy had been left home alone. Thomas was brought out of the residence and arrested for child endangerment. The officers read Thomas her *Miranda* rights and asked her to consent to a search of her residence. She refused consent.

The officers applied for and obtained a warrant to search Thomas's residence for additional drugs or drug paraphernalia. While the officers awaited the warrant, Kosgard was in the residence with the boy and a police officer was stationed with her to secure the premises. Thomas was held

---

1. Officers later learned that the driver was Roy Caskey.

in a patrol car, and repeatedly asked the officers to allow her to return to her residence. The eventual search resulted in the police finding $310 cash and four rocks of crack cocaine.

Thomas was charged with possession of a controlled substance with intent to deliver, child endangerment, and delivery of a controlled substance. Her motion to suppress the results of the search was denied. Before trial, Thomas moved in limine, among other things, to exclude "[a]ny reference to the Defendant's reported refusal to permit a voluntary search of the premises in question. Whether someone claims their constitutional rights is not relevant to whether a crime has occurred."

At the hearing on the motions, the State argued "it would be evidence of the defendant's recognition that she had illegal substances in her residence and so therefore wasn't going to grant consent because if officers went in and did a search, they would find the drugs." The district court denied the motion in limine.

At trial, the State's opening argument included the following:

Now given those statements by Roy Caskey, then Christina Thomas obviously becomes the focus of their investigative efforts. They then go to approach the residence to speak with Christina. She comes outside. They are going to arrest her for child endangerment—obviously we have the delivery of crack cocaine. She is taken to Officer Gruenhagen's car and she's placed in the car. She is Mirandized. And then she begs him to let her out and her focal point was she wanted to get back into that house and that was the constant focus of her comments, to please write her a ticket, please let her go, she needed to get back to the house. It wasn't about the child, she needed to get back into the house.

This raised Officer Gruenhagen's suspicions because you have the delivery of crack cocaine and she is really urgent about the need to get back into that house. Consent was requested so that officers could go in and do a search. She wouldn't give consent.

Thomas continued to object to any evidence concerning her refusal to consent to a warrantless search. The district court continued to overrule the objections. The following testimony by Officer Gard was received over Thomas's objections;

Q. What were you focusing on at this point? A. Quantity of crack cocaine.

Q. Did you believe there might be drugs located somewhere? A. I believe there was some still in the residence, yes.

Q. Because of that, were there any conversations with the defendant about that? A. I believe Corporal Gruenhagen asked her if he could—

[Defense counsel]: Objection, hearsay.

THE COURT: Sustained.

[By Prosecutor]:

Q. Based on your involvement was consent given to search the residence?

[Defense counsel]: Your Honor, I would object for the reasons previously urged.

THE COURT: Overruled.

. . . .

Q. Was consent given to search the residence? A. No, it was not.

The prosecutor then asked about the search warrant application. Thomas's counsel objected and moved for mistrial. The court overruled the motion, but instructed the county attorney:

[h]owever, the Court will direct the county attorney to not get into any great detail on the search warrant application. That really is not necessary in the

Court's estimation. The jury is entitled to know there was a search warrant, it was applied for and it was allowed and that's the basis of the search of the defendant's residence, but I see anything much more beyond that as material that is not terribly relevant to this case.

The prosecutor later questioned Officer Gruenhagen about Thomas's refusal of consent to search her home.

Q. Did you want to do a search of that residence? A. Yes.

Q. What was the first step you took in an attempt to search that residence? A. After arresting Christine Thomas, I advised her of her Miranda rights. She advised me that she understood them.

[Prosecutor]: If we could, Your Honor, just real quick—may we approach?

THE COURT: Go ahead.

. . . .

[By Prosecutor]:

Q. With that, did you ask her for consent to search the residence? A. After I asked her—after I advised her of Miranda, I did ask. I asked her for her consent verbal and written to search the interior of her home for narcotics.

Q. What was the—A. She refused to give verbal consent and she refused to give written consent.

Q. Having said that then, what did you notice about the defendant and the behaviors that she began to exhibit from that point?

Defense counsel again objected and the jury was excused. Defense counsel again moved for a mistrial, and the following argument ensued.

[By prosecutor]: . . . When we talk about the rights exercised, we talk about the right to not incriminate oneself. There has been no suggestion that she refused to respond to questioning. This simply is about a Fifth Amendment—a Fourth Amendment issue and if she doesn't give consent, then the officers have to get a search warrant and it is an explanation to the jury about that. That's all. It is very simple.

[By defense counsel]: It is not—if it is that, very simply then why does she want it in other than the fact that she believes the fact she denied the request to consent is incriminatory in nature, otherwise it would not have come in from the State.

[By prosecutor]: I disagree with that. . . . There has been suggestion made through the motion to suppress that officers were inappropriate and may have conducted a search, and that's something that the State needs to address so the jury understands that the officers asked for the search warrant under the circumstances, and that way no allegations can be raised about any type of wrongdoing by the officers. It is about protecting the record and shutting down arguments that counsel may make.

THE COURT: Counsel's motion for a mistrial is denied. The Court does not find that the record presented to date is such that it implicates Doyle v. Ohio and the constitutional issues that are addressed and raised in that ruling.

Having said that, counsel, I think we are past the point where any additional testimony in regards to either the consent or any discussion with the Defendant at the scene is necessary and to the extent that counsel for the defense has raised that issue, I will rule at this point that there—at this point that that has become at best cumulative and that there need be no further testimony on those issues.

When the jury returned the prosecutor questioned Officer Gruenhagen about

Thomas's requests to re-enter her home. The officer also testified further about the search warrant application procedure until the court sustained defense counsel's objection.

In closing argument the prosecutor argued that Thomas's refusal to consent to search was evidence of her guilt.

> When they got that rock of crack cocaine from Roy and they had the contact with her and she was placed in the back of the squad car, Officer Gruenhagen told you that he asked her for consent—both verbal and written consent—to go into that house to search. She didn't give any verbal consent, but she refused to sign off on a piece of paper that she would not give consent, and at that point in time, he made it clear that they were going to get a search warrant. The Defendant, how did she react? She begged him just to release her, let her go back. She kept wanting to get into that house. Why did she want to get back into that house? And if you go back to the beginning, that source of cocaine delivered from Roy—or delivered to Roy came from someplace. Christine made that delivery. Where was that supply? What was in the house? Who denied consent? What does that say about her state of mind in terms of knowing there is drugs there, and why did she want to get back into that house before officers applied for a search warrant?

Thomas was convicted as charged and now appeals. She argues that the court erred in admitting evidence that she refused to consent to the search of her home. At trial, Thomas moved in limine to ex-clude the evidence as a violation of her constitutional rights and because it was not relevant. On appeal, Thomas contends our standard of review is de novo, claiming the issue involves her constitutional rights to remain silent, not to be a witness against herself, not to be subject to an unreasonable search, and to be afforded a fair trial.[2] The State argues the issue is a traditional relevance question.

## II. Discussion

**A. Constitutional implications.** No reported Iowa case deals directly with the issue of the admissibility of a defendant's refusal to consent to a search of her residence. Courts from other jurisdictions have concluded that there is a constitutional right to refuse and that use of that refusal at trial constitutes error. *See, e.g., Elson v. State*, 659 P.2d 1195, 1199 (Alaska 1983) (holding "that evidence of a refusal to consent to a search is inadmissible regardless of the legality of the search"); *Longshore v. State*, 399 Md. 486, 924 A.2d 1129, 1159 (2007) (concluding that "[a] person has a constitutional right to refuse to consent to a warrantless search of his or her automobile, and such refusal may not later be used to implicate guilt."); *Reeves v. State*, 969 S.W.2d 471, 493–95 (Tex.Ct.App.1998) (discussing case law and concluding that "[t]o allow the use of one's refusal to consent to entry into his home without a warrant would be to impose a penalty for exercising a constitutional right," which was error). The constitutional basis for the "right to refuse" generally relies upon some derivative or combination of the Fourth, Fifth, and/or Fourteenth Amendments. *Elson*, 659

---

**2.** The defendant further acknowledges that the claim of denial of a fair trial was not made below. She contends trial counsel was ineffective in failing to raise the due process claim. Because we do not reach the constitu-tional issue, we need not address the State's argument that this error was not preserved or defendant's ineffective-assistance-of-counsel claim.

P.2d at 1197 (citing Fourth and Fifth Amendments); *State v. Palenkas,* 188 Ariz. 201, 933 P.2d 1269, 1280 (Ct.App. 1996) (holding "the prosecution's references to defendant's invocation of his fourth amendment rights to refuse to consent to a warrantless entry and to his contact with an attorney prior to his arrest violated defendant's due process rights to a fair trial"); *Longshore,* 924 A.2d at 1158 (drawing analogy from United States Supreme Court cases that hold that a defendant's assertion of the Fifth Amendment right to remain silent may not be used against the defendant at trial).

One commentator has argued that these cases—while generally coming to the right conclusion that the evidence is inadmissible—unsatisfactorily base their reasoning on constitutional principles. Kenneth J. Melilli, *The Consequences of Refusing to Consent to a Search or Seizure: The Unfortunate Constitutionalization of an Evidentiary Issue,* 75 S. Cal. L.Rev. 901, 903–18 (2002). The commentator argues admissibility of "refusal to consent" should be determined "upon ordinary rules of evidence." *Id.* at 937. On the record before us and defense counsel's objections to the evidence, we do not reach the constitutional claim,[3] but turn to an analysis under our evidentiary rules.

■ **B. Rules of Evidence.** The inquiry whether evidence is admissible under our Iowa Rules of Evidence 402 and 403 involves a two-step inquiry: first, is the evidence relevant? If so, is its probative value substantially outweighed by the danger of prejudice or confusion? Evidence is relevant if it has a tendency to make a consequential fact more or less probable than it would be without the evi-

dence. Iowa R. Evid. 401; *McClure v. Walgreen Co.,* 613 N.W.2d 225, 235 (Iowa 2000). Even relevant evidence, however, is not admissible "if its probative value is substantially outweighed by the danger of unfair prejudice." Iowa R. Evid. 403.

■ Under these ordinary rules of evidence, generally exercising one's privilege to be free from warrantless searches is simply not probative (or has low probative value) to a determination of guilt, and is unfairly prejudicial. Thus, the defendant's right not to be penalized for exercising such a privilege is paramount. *See, e.g., United States v. Thame,* 846 F.2d 200, 207 (3rd Cir.1988). *Cf. United States v. Hale,* 422 U.S. 171, 180, 95 S.Ct. 2133, 2138, 45 L.Ed.2d 99, 107 (1975) ("Not only is evidence of silence at the time of arrest generally not very probative of a defendant's credibility, but it also has a significant potential for prejudice.").

■ On the other hand, when such evidence is probative for some purpose other than to simply penalize the defendant for exercising a constitutional right, then notions of fair play and the need to preserve the truth-testing functions of the adversarial process may outweigh the prejudice. For instance, evidence of refusal to consent to a warrantless search has been admitted as "fair response" to rebut a defendant's theory. *See Leavitt v. Arave,* 383 F.3d 809, 828 (9th Cir.2004) (noting that comments regarding one's exercise of Fourth Amendment rights are generally improper unless such comments fairly rebut a claim by defendant—in this case, evidence showing that defendant was the only suspect who refused to voluntarily give a blood sample was properly admitted to rebut defendant's claim that he cooper-

---

**3.** "[W]e are constrained by our principles of self-restraint, including the longstanding rule that we will not decide constitutional ques-

tions when a case can be resolved on other grounds." *State v. Williams,* 695 N.W.2d 23, 30 (Iowa 2005).

ated with the investigation); *United States v. Dozal,* 173 F.3d 787, 794 (10th Cir.1999) (finding no Fourth Amendment violation where comments regarding defendant's refusal to permit search were admitted for proper purposes and were not meant simply to penalize defendant for exercising a constitutional right—in this case, the evidence helped establish that defendant had dominion and control over the premises); *United States v. McNatt,* 931 F.2d 251, 258 (4th Cir.1991) (finding no Fourth Amendment violation where comments regarding defendant's refusal to permit search were in fair response to defendant's argument that drugs were planted by police in his vehicle).

Questions of the admissibility of evidence are generally reviewed for an abuse of discretion. *State v. Rodriquez,* 636 N.W.2d 234, 239 (Iowa 2001). An abuse of discretion occurs when the trial court exercises its discretion "on grounds or for reasons clearly untenable or to an extent clearly unreasonable." *State v. Maghee,* 573 N.W.2d 1, 5 (Iowa 1997). We presume prejudice from the admission of irrelevant evidence. *See Lewis v. Kennison,* 278 N.W.2d 12, 15 (Iowa 1979). Accordingly, reversal is required unless the record shows a lack of prejudice. *See McClure,* 613 N.W.2d at 235. Thus, despite the discretionary nature of the trial court's decision to admit evidence, we do not hesitate to reverse "when the jury was allowed to consider plainly irrelevant and prejudicial evidence." *State v. Oppedal,* 232 N.W.2d 517, 520 (Iowa 1975).

**C. Relevance of Refusal of Consent.** We have already set forth in some detail the testimony of and argument surrounding the admission of Thomas's refusal to consent to a search. Thomas's refusal to consent to a search of her home was a recurring theme in the State's case. The prosecutor's justification for the refusal to consent evidence was "it would be evidence of the defendant's recognition that she had illegal substances in her residence and so therefore wasn't going to grant consent because if officers went in and did a search, they would find the drugs." This is precisely the improper inference the rules of evidence seek to avoid.

Contrary to the prosecutor's argument, a defendant's refusal to consent to a warrantless search is too ambiguous to be relevant—it could mean several things, particularly when it is made post-arrest and post-Miranda. As one court has concluded:

> *Because the right to refuse entry when the officer does not have a warrant is equally available to the innocent and the guilty,* just as is the right to remain silent, *the refusal is as "ambiguous"* as the silence was held to be in *United States v. Hale* . . . . Yet use by the prosecutor of the refusal of entry, like use of the silence by the prosecutor, can have but one objective to induce the jury to infer guilt. In the case of the silence, the prosecutor can argue that if the defendant had nothing to hide, he would not keep silent. In the case of the refusal of entry, the prosecutor can argue that, if the defendant were not trying to hide something . . . she would have let the officer in. In either case, whether the argument is made or not, the desired inference may be well drawn by the jury. *This is why the evidence is inadmissible in the case of silence. It is also why the evidence is inadmissible in the case of refusal to let the officer search.*
>
> *Inadmissible evidence, which can readily be misinterpreted by the jury, should not be admitted just to put the relevant facts in their true setting* . . . . *[T]he facts in issue are so ambiguous as to be irrelevant.* Moreover, they are so

readily subject to misinterpretation by a jury as to render a curative or protective instruction of dubious value.

*United States v. Prescott*, 581 F.2d 1343, 1352 (9th Cir.1978) (internal citations omitted) (emphasis added). As Thomas's counsel argued,

> if someone comes and knocks on my door and says they want to walk through my house, I have the absolute right to say no it is not—it is not indicative of anything other than I know what my rights are.

We conclude the evidence of Thomas's refusal to consent was irrelevant and unfairly prejudicial, and the district court erred in admitting it.

 The prosecutor argued, and the trial court apparently agreed, that the testimony gave context to why the police sought a search warrant. However, "[I]nadmissible evidence, which can readily be misinterpreted by the jury, should not be admitted just to put the relevant facts in their true setting." *Prescott*, 581 F.2d at 1352. The prosecutor also argued the evidence was admissible to "shut[ting] down arguments" the defense might make. However, this highly prejudicial evidence was not offered to rebut any defense that had been presented to the jury.

 We conclude the admission of Thomas's refusal to consent to a warrantless search was prejudicial error. We therefore reverse the two drug convictions and remand for a new trial on those counts.

 **D. Child Endangerment.** Thomas also argues that the admission of hearsay evidence was prejudicial to her and that the record contains insufficient evidence to convict her of child endangerment. We uphold a verdict if substantial evidence supports it. *State v. Quinn*, 691 N.W.2d 403, 407 (Iowa 2005). "Evidence is substantial if it would convince a rational fact finder that the defendant is guilty beyond a reasonable doubt." *Id.* The erroneous admission of hearsay is presumed to be prejudicial; however, we will not find prejudice if the admitted hearsay is merely cumulative. *State v. Hildreth*, 582 N.W.2d 167, 170 (Iowa 1998).

The evidence supporting the child endangerment conviction includes Engesser's testimony that Thomas's child was wandering the neighborhood in the very early hours of the morning and knocked on his door to get help finding his mother. When Engesser went to Thomas's residence, it appeared empty and no one responded to his calls. Roy Caskey testified that when he dropped Christine Thomas off at her residence, they saw a police officer walking in front of her house and Thomas said "the baby must have woke [sic] up." Caskey also testified that Thomas called him again at about 2:30 a.m. and asked him to pick up her mother in Moline and bring her to Thomas's home. Thomas had told the officers that her mother had been at Thomas's home to care for her child.

Thomas complains of the testimony of an officer that he had a conversation with Thomas's mother, which led him to determine that the child had been left alone. Even if we were to determine that the evidence in question was hearsay, that evidence is cumulative to Caskey's testimony and did not add to the evidence supporting the child endangerment conviction.

The State's evidence supporting the child endangerment count is sufficient to convince the jury that Christine Thomas had left her young son at home alone in the middle of the night. The child endangerment conviction is affirmed.

**AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**