# IN THE COURT OF APPEALS OF IOWA

No. 21-1722
Filed February 8, 2023

**STATE OF IOWA,**
Plaintiff-Appellee,

**vs.**

**GREGG EUGENE WINTERFELD,**
Defendant-Appellant.
_____

Appeal from the Iowa District Court for Sioux County, Jeffrey A. Neary, Judge.

A defendant appeals from his conviction for second-degree murder. **AFFIRMED.**

Priscilla E. Forsyth, Sioux City, for appellant.

Brenna Bird, Attorney General, and Thomas E. Bakke, Assistant Attorney General, for appellee.

Heard by Greer, P.J., Chicchelly, J., and Danilson, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2023).

**GREER, Presiding Judge.**

In May of 2020, Gregg Winterfeld fatally shot Grant Wilson. At his criminal trial, Winterfeld claimed, as he had from the time of the 911 call, that he acted in self-defense. He was ultimately convicted of second-degree murder by a jury.[1] On appeal, he argues (1) the district court abused its discretion in admitting irrelevant voicemail messages that contained hearsay and a transcript of those messages from Wilson's long-term partner, Theresa, which were found on Winterfeld's phone and (2) the State failed to prove beyond a reasonable doubt that Winterfeld did not act in self-defense. Because admission of the voicemails, whether relevant or not, was not prejudicial and they were not hearsay, and because there is substantial evidence supporting the jury's rejection of Winterfeld's justification claim, we affirm.

**I. Facts and Prior Proceedings.**

On the evening of May 9, 2020, Theresa, Winterfeld, and Wilson were gathered at Winterfeld's mother's farm home so Winterfeld could fix a lawnmower Theresa was hoping to sell. Theresa and Winterfeld had been friends since Theresa's grade school years—she often referred to Winterfeld as her "big brother,"—while Theresa and Wilson had been in a relationship for nearly twenty years. Winterfeld and Wilson were drinking alcohol together, and Wilson decided

---

[1] Although he was initially charged with first-degree murder, in a first trial held in early 2021, Winterfeld was found guilty of a lesser-included offense, second-degree murder. But because the district court allotted him an insufficient number of preemptory strikes during his jury selection, he was granted a new trial. The second trial occurred in October 2021, and it is from that trial that this appeal originates.

he and Theresa would stay the night rather than drive home; no longer concerned about driving, Theresa also began to drink alcohol.[2]

Just after 10:00 p.m., Theresa called 911 to report that Winterfeld, acting in self-defense, shot Wilson. When Sergeant Justin DeBruin arrived at the home and asked what happened to Wilson, Winterfeld said, "He [came] at me with a knife and I shot him." When Sergeant DeBruin asked where the knife was, Winterfeld responded it was actually a cellphone that he mistook as a knife. As the night went on and Sergeant DeBruin and Deputy Brad DeKam interviewed Winterfeld, he explained that Wilson was already intoxicated when he and Theresa arrived at the farm that afternoon, and Wilson and Winterfeld continued to drink beer and then whiskey. The three got along for the most part, but Wilson was intermittently making threats against Winterfeld or arguing with Theresa. At first, Winterfeld thought they were just joking; but he said Wilson was a scary man who could threaten someone with just a look. Something made Wilson mad and he said it was time to go home, but the couple could not leave because Theresa had been drinking. Instead, Wilson went out to sleep in Theresa's car. Wilson was making Winterfeld nervous, so he locked the door and put on his holster with his .22 caliber, single-action revolver. Eventually, Winterfeld cajoled Wilson back into the house. Then Wilson got angry again, prompting Winterfeld to remove his gun from his holster. Wilson moved to walk out the door again, and Winterfeld told him to just sleep on the couch. As they were arguing, Winterfeld cocked his gun, but left

---

[2] Theresa's car had an ignition interlock, which prevented her from turning on the car after consuming alcohol.

it by his side. Wilson then turned around, pulled something from his pocket,[3] and turned to Winterfeld with his arms up and a look in his eyes that told Winterfeld Wilson had lost his temper.[4] Winterfeld explained to officers this was the same look he witnessed on Wilson's face when he would hit Theresa. Winterfeld then shot Wilson almost in the middle of his forehead.

Winterfeld was arrested. During Winterfeld's intake, Deputy DeKam took photographs of him, which reflect no injuries attributable to Wilson. None of Wilson's blood was found on Winterfeld. Officers executed a search warrant on the farm house, including Theresa's, Wilson's, and Winterfeld's phones. On Winterfeld's phone, they found a number of voicemails from Theresa. Most of them described violence between her and Wilson, often asking for help to find a new housing situation to get away from him, and sometimes reporting she wanted Wilson dead.

Before the new trial for second-degree murder (following an unrelated procedural error in the first trial), Winterfeld filed a motion in limine to exclude the voicemails and their transcript, arguing they were (1) irrelevant because there was no proof Winterfeld ever heard the voicemails and (2) inadmissible hearsay. The district court found the voicemails and transcript were relevant and not hearsay. As a strategy at trial, Winterfeld decided to expand the number of voice messages beyond what the State's exhibit included and so, it was he who entered all 132

---

[3] Wilson did have a knife on him, but investigators found it still securely clipped onto his pants pocket. No cellphone was found by his body.

[4] Theresa told the officers that she heard Wilson say he was going to kill Winterfeld and heard Winterfeld tell Wilson to put the knife away. She also gave this testimony at trial. Winterfeld testified he did not recall either statement.

voicemails[5] extracted from his phone as evidence. The State flagged this for the district court, stating that the admission constituted a waiver of any objection to the evidence. Winterfeld and the district court disagreed with the State's position, but the court noted it was ultimately an issue for an appellate court. The State offered the extraction report from Winterfeld's phone, including text messages between Winterfeld and Theresa and a phone log that showed they were on the phone for more than two hours on May 8.

At the trial, Dr. Dennis Klein, the State Medical Examiner and a forensic pathologist, testified about the autopsy he conducted on Wilson. Wilson's blood alcohol concentration was .360; for someone without a tolerance for alcohol, Dr. Klein explained, this would be lethal, though an experienced drinker could still be awake. Based on the bullet's path, it appeared the gun was fired while level with the ground. The autopsy also revealed an internal injury on the back of Wilson's head; Dr. Klein testified this was consistent with Wilson falling to the ground or being struck with a flat object. Sergeant DeBruin testified that, based on how Wilson's body had fallen, he was most likely stationary when shot rather than moving toward Winterfeld. Also, the State's firearm and toolmark examiner testified that the gun was probably fired with six inches to three feet between the muzzle and Wilson.

Winterfeld chose to testify at trial and provided a different version of events, explaining he was in shock when he first spoke to officers and could not remember the details he presently could. He testified that after he convinced Wilson to come

---

[5] The State's exhibit contained recordings of only twenty-nine voice messages from Theresa.

inside and Wilson turned to leave again to walk home, he had tapped Wilson on the shoulder and told him to have something to eat and lie down on the couch. According to Winterfeld, Wilson then turned around and grabbed him by the throat. Winterfeld tried, unsuccessfully, to get out of Wilson's grasp by grabbing his gun and using it to hit Wilson in the side of the head. When he could not break free, Winterfeld cocked the gun and brought it up above Wilson's arms before pulling the trigger. Wilson then went limp, and he and Winterfeld fell to the ground.

Winterfeld also testified he listened to some of the voicemails and was concerned about how Wilson treated Theresa but stopped because the messages were always the same and he did not want to get involved. When he and Theresa spoke on the phone, it was often a similar conversation. Winterfeld admitted that because of his concern about Theresa, on May 9, he tried to convince Wilson to stop the abuse.

Winterfeld was again found guilty of second-degree murder. He filed a motion in arrest of judgment and for dismissal, citing his objection to the admission of the voicemails and transcripts; the court denied the motion. Winterfeld timely appealed.

## II. Discussion.

A. Voicemails and Transcript.

Winterfeld argues, as he did in his motion in limine, the voicemails and the transcript of them were wrongly admitted because they were irrelevant, *see* Iowa R. of Evid. 5.402 ("Irrelevant evidence is not admissible."), and violated the rules against hearsay, *see* Iowa R. of Evid 5.802 ("Hearsay is not admissible unless any of the following provide otherwise: the Constitution of the State of Iowa; a statute;

these rules of evidence; or an Iowa Supreme Court rule."). The State disagrees with both assertions and further argues Winterfeld cannot now dispute the entry of the voicemails because he introduced them at trial, not the State.

Typically, because it is not the grant or denial of a motion in limine that amounts to reversible error, "[t]he error occurs, if at all, when the [evidence in question] is presented at trial." *State v. Harlow*, 325 N.W.2d 90, 91 (Iowa 1982). So, to preserve error, the resisting party is required to object at the time the evidence is offered at trial. *State v. Thoren*, 970 N.W.2d 611, 621 (Iowa 2022). There is an exception to the rule, though, if the ruling on the motion in limine constitutes a final ruling because it "reaches the ultimate issue and declares the evidence admissible or inadmissible;" in that instance, no further argument is necessary at trial to preserve error. *State v. O'Connell*, 275 N.W.2d 197, 202 (Iowa 1979).

Following this path, the State argues Winterfeld cannot cry error when he put the voicemails into evidence. But our supreme court has recognized that criminal defendants, when faced with the knowledge that damning evidence is coming in following the denial of pretrial suppression motions, can preemptively bring that evidence in on their own terms to "remove the sting" without waiving their right to object to the evidence's admission. *State v. Daly*, 623 N.W.2d 799, 801 (Iowa 2001) (citation omitted); *see, e.g.*, *State v. Jones*, 271 N.W.2d 761, 766 (Iowa 1978) ("Where the issue is fully argued and trial court, carefully apprised of defendant's objection, rules evidence of prior convictions admissible, we are not convinced defendant must abandon all trial tactics to preserve error. We hold defendant has not waived his right to assert error in this instance."). And a panel

of this court has previously relied on this logic, citing *Jones* specifically, to allow a plaintiff to tactically introduce evidence they had previously sought to suppress without waiving their right to challenge that evidence later. *Ray v. Paul*, 563 N.W.2d 635, 638 (Iowa Ct. App. 1997) ("Because the trial court's ruling on admissibility was dispositive, [the party] did not waive any resulting error by electing for strategic reasons to introduce this evidence as a part of her case."). We find that, because the ruling on the motion in limine was a final ruling determining the evidence was admissible, Winterfeld was free to make strategic decisions to offer the evidence himself without waiving his argument the evidence should have been excluded; so, we move to the substance of Winterfeld's arguments.[6]

To begin, we generally review evidentiary rulings for an abuse of discretion. *State v. Buelow*, 951 N.W. 879, 884 (Iowa 2020). "An abuse of discretion occurs when the trial court exercises its discretion 'on grounds or for reasons clearly untenable or to an extent clearly unreasonable.'" *State v. Rodriquez*, 636 N.W.2d 234, 239 (Iowa 2001) (citation omitted). "A ground or reason is untenable when it is not supported by substantial evidence or when it is based on an erroneous

---

[6] At oral argument before this court, Winterfeld also noted that exhibits 78 and 79 were admitted over his objection at trial prior to his admission of the voicemails; exhibit 78 is a report from the phone-data extraction that included summaries of the twenty-nine voicemails the State sought to admit. The State accurately responded at oral argument that the objection made to exhibit 78 was a completeness objection rather than an objection to exclude the report based on hearsay or relevance. Regardless, this argument is irrelevant because Winterfeld did not need to object at any point after the court made its final ruling on the motion in limine to preserve his current challenge.

application of the law." *Id.* (citation omitted). But a determination that evidence is or is not hearsay is reviewed for errors at law. *Id.*

 *i. Relevance.*

 Winterfeld argues, as he did in his motion in limine, that the voicemails and transcript are irrelevant because the State could not prove he had listened to them. Further, he argues that while the voicemails may have been relevant as to motive and premeditation under the original first-degree-murder charge, they were not relevant to the elements of proof in the second trial when he was charged with second-degree murder.[7]

 "Evidence is relevant if: a. It has any tendency to make a fact more or less probable than it would be without the evidence; and b. The fact is of consequence in determining the action." Iowa R. Evid. 5.401. In other words, "Evidence is relevant if it can 'throw any light upon the matter contested.'" *Buelow*, 951 N.W.2d at 885 (citation omitted). Under this test, "a court must first determine whether the evidence is relevant to a legitimate, disputed factual issue." *State v. Putman,* 848 N.W.2d 1, 9 (Iowa 2014). As Winterfeld frames it, the voice messages were used by the State to show his motive, but the failure to prove Winterfeld ever listened to them breaks the link to any claimed relevance. And it is true the State conceded

---

[7] One of the essential elements of second-degree murder is malice aforethought or "a fixed purpose or design to do some physical harm to another existing prior to the act complained of." *State v. Reeves*, 670 N.W.2d 199, 206–07 (Iowa 2003). While motive is not necessary to show malice aforethought, *id.* at 207, it is relevant, *State v. Hoffer*, 383 N.W.2d 543, 549 (Iowa 1986). *See State v. Newell*, 710 N.W.2d 6, 21 (Iowa 2006) ("'Because [malice aforethought] is a state of mind, circumstantial evidence is generally used to prove malice.' We have held the prior relationship between the defendant and the victim, including bad feelings, quarrels, and physical acts, is a circumstance that may be shown to prove the defendant's state of mind and motivation at the time of the crime." (citation omitted)).

it could not prove Winterfeld listened to a specific message—Theresa testified he did not return calls after she left the messages and, in his trial testimony, Winterfeld denied hearing them. But before getting into the weeds on this issue, we note no one disputes that Winterfeld already knew about the abusive relationship between Wilson and Theresa or that Winterfeld knew the content of at least some of the voicemails as he told law enforcement he listened to "maybe half" of them.

But even if the evidence was wrongly admitted, "[r]eversal is not required for the erroneous admission of evidence unless prejudice results." *Rodriquez*, 636 N.W.2d at 244; *see also State v. Sullivan*, 679 N.W.2d 19, 30 (Iowa 2004) (explaining the turn to Iowa Rule of Evidence 5.103(a) to determine if the error was harmless after determining a court abused its discretion in admitting irrelevant evidence and defining prejudice in this context, as opposed to the unfair prejudice context under rule 5.403, as affecting a substantial right of the defendant). And while "[w]e presume prejudice from the admission of irrelevant evidence," this presumption can be combatted if "the record shows a lack of prejudice." *State v. Thomas*, 766 N.W.2d 263, 271 (Iowa Ct. App. 2009). Here, there was ample other evidence of Winterfeld's knowledge about Wilson and Theresa's relationship—in the interviews with police immediately following the shooting and his testimony at trial, Winterfeld confirmed his knowledge of the violence in the relationship.[8] In

---

[8] At trial, Winterfeld admitted he listened to some of the voicemails Theresa left him in 2018, none of which were the voicemails the State sought to admit as evidence. But, Winterfeld testified that the voicemails he did listen to made him concerned Theresa was being abused. He also testified that when they spoke on the phone, Theresa would "basically tell [him] the same thing [as what was in the voicemails]." Though he denied the fact at trial, in his initial police interview he stated he witnessed physical violence between Wilson and Theresa on a few occasions. And, a series of text messages from Theresa to Winterfeld were

fact, Winterfeld admitted that, on the day of the shooting, he and Wilson had a conversation about the abuse where Winterfeld tried to convince Wilson to stop the behavior. Because Winterfeld's knowledge of Wilson's violence towards Theresa was shown by evidence outside of the voicemails, Winterfeld cannot show he was prejudiced by their admission.

As an alternative argument, Winterfeld argues the probative value of the voicemails and transcripts were substantially outweighed by their unfairly prejudicial effect because they depict domestic abuse and Theresa's desire—and struggle—to get out of the situation she was in. *See* Iowa R. Evid. 5.403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger . . . unfair prejudice."). "'Unfair prejudice' is the undue tendency to suggest decisions on an improper basis, commonly though not necessarily, an emotional one." *State v. Neiderbach*, 837 N.W.2d 180, 202–03 (Iowa 2013) (citation omitted). Because an exclusion under this rule means the fact finder is deprived of relevant evidence, courts are to use it sparingly. *See Buelow*, 951 N.W.2d at 889. And, "[i]f the balance between the evidence's probative value and prejudicial effect is relatively close, the evidence should be admitted." *Id.* Considering the probative value of the evidence, which points both to the discord between Wilson and Winterfeld and Winterfeld's understanding that Wilson was a violent man, we do not find any unfairly prejudicial effect that would

---

entered into evidence without objection; they also reflect Theresa asking for help, being afraid of Wilson, being threatened by him, and wishing he was dead. *See State v. Windsor*, 316 N.W.2d 684, 688 (Iowa 1982) ("[E]ven when the ruling is erroneous, reversal is not required when no prejudice results. One respect in which the presumption of prejudice may be overcome is by showing the same evidence came into the record at another time.").

require the evidence to be excluded. *See Neiderbach*, 837 N.W.2d at 202 ("[I]n a sense, all powerful evidence is prejudicial to one side. The key is whether the danger of unfair prejudice substantially outweighs the evidence's probative value."); *cf. State v. Lacey*, 968 N.W.2d 792, 807–08 (Iowa 2021) (affirming the district court's decision to exclude messages containing sexually explicit and racist statements intended to convince the jury the victim was a "monster" who "deserved a beating"). In *Lacey*, the district court excluded certain emails that were potentially prejudicial after finding the content immaterial. *Lacey*, 968 N.W.2d at 807–08. In contrast to the facts in *Lacey*, the content of the voicemail messages here was both relevant and material to the State's attempt to show that Winterfeld was motivated by the messages' content whether or not they were true. Of course, Winterfeld had the opportunity to present evidence that he did not know the content of the voicemails and that he acted in self-defense. Here, the voicemails and transcript provided a clear snippet of what Theresa told Winterfeld about Wilson. We find no abuse of the court's discretion in allowing the voicemails—and by extension, the transcripts[9]—into the record as relevant evidence under rule 5.403.

*ii. Hearsay.*

Next, Winterfeld argues the voicemails and transcript should have been excluded as hearsay evidence. Hearsay evidence is a statement "[t]he declarant does not make while testifying at the current trial or hearing" and that "a party offers into evidence to prove the truth of the matter asserted in the statement." Iowa R. Evid. 5.801(c). But "[t]he rule prohibiting hearsay evidence only forbids an out-of-

---

[9] As the district court instructed the jury at trial, the transcripts were offered as an aid and not as substantive evidence.

court statement used 'to prove the truth of the matter asserted in the statement.'" *State v. Dessinger*, 958 N.W.2d at 590, 603 (Iowa 2021) (citation omitted).

Winterfeld argues the voicemails are hearsay evidence because they are offered to prove their truth. But, as the district court noted, the evidence was not offered to prove that Wilson was abusing Theresa, that Theresa was trying to get out of the relationship, or that Theresa wanted Wilson dead; they were all offered to show Winterfeld's understanding of the dynamics allegedly at play in Theresa and Wilson's relationship. *See State v. Frerichs*, No. 04-0665, 2005 WL 1630016, at *2 (Iowa Ct. App. July 13, 2005) ("Therefore, because the evidence was not offered for the truth of the matter asserted therein, but rather to infer [the defendant's] knowledge, it was not hearsay."); *State v. Huser*, No. 10-2067, 2011 WL 6079120, at *10 (Iowa Ct. App. Dec. 7, 2011) ("Statements often falling outside the scope of hearsay include those which tend to show the effect of the statement on its recipient. 'The statement may be offered simply to demonstrate it was made, to explain subsequent actions by the listener, or to show notice or knowledge of the listener.'" (citations omitted)). The district court, then, did not err in finding the voicemails were not hearsay.

B. Self-Defense.

Winterfeld next argues the State failed to prove he was not acting in self-defense. "We review the sufficiency of the evidence for correction of errors at law." *State v. Crawford*, 972 N.W.2d 189, 202 (Iowa 2022). "In conducting that review, we are highly deferential to the jury's verdict. The jury's verdict binds this court if the verdict is supported by substantial evidence." *Id.* "Evidence is substantial if it could convince a rational fact finder that the defendant is guilty beyond a

reasonable doubt." *State v. Bayles*, 551 N.W.2d 600, 608 (Iowa 1996). We view the evidence in the light most favorable to the State. *State v. Fordyce*, 940 N.W.2d 419, 426 (Iowa 2020).

Winterfeld pled not guilty by reason of self-defense or justification. "Justification is a statutory defense permitting a person to use reasonable force, including deadly, if that person reasonably believes the force used was necessary to defend himself or another from any imminent use of unlawful force." *Id.* at 425; *see also* Iowa Code §§ 704.2, 704.3 (2019). The jury was instructed the State had to prove, beyond a reasonable doubt, that Winterfeld acted without justification. *See Fordyce*, 940 N.W.2d at 426 ("When self-defense is raised, the burden rests with the State to prove beyond a reasonable doubt that the justification did not exist."). The instructions outlined that "[r]easonable force is only the amount of force a reasonable person would find necessary to use under the circumstances to prevent death or injury" and that "[a] person can use deadly force against another if it is reasonable to believe that such force is necessary to avoid injury or risk to one's life or safety or the life or safety of another, or it is reasonable to believe that such force is necessary to resist a like force or threat." The State could disprove Winterfeld's justification defense by proving any of the following: Winterfeld (1) "started or continued the incident which resulted in death," (2) "did not believe he was in imminent danger of death or injury and the use of force was not necessary to save him," (3) "did not have reasonable grounds for the belief," or (4) "the force [he used] was unreasonable."

In this case, there was ample evidence discounting the version of events Winterfeld presented at trial, including the lack of bruising on his throat and the

major differences between his initial telling of events and his version at trial. And taking the evidence in the light most favorable to the State, by Winterfeld's initial account of events immediately following the shooting, the "threat" he perceived was just the look in Wilson's eyes—even his statement that Wilson was coming at him with something in his hands could be countered by how Wilson fell, the knife securely remaining in his pocket, and that no cell phone was found by the body. A reasonable fact finder could find that this look alone did not warrant a gunshot between the eyes, making Winterfeld's use of force unreasonable. Because we find substantial evidence supporting the jury's verdict, we will not disturb it.

**III. Conclusion.**

Because we find the admission of the voicemails and transcript into evidence was not prejudicial to Winterfeld and they were not hearsay, and because there was substantial evidence combatting Winterfeld's asserted justification claim, we affirm.

**AFFIRMED.**